# UNITED STATES v. AMERICAN SUGAR REFINING COMPANY.

APPEAL FROM THE CIRCUIT COURT OF THE UNITED STATES FOR THE SOUTHERN DISTRICT OF NEW YORK.

No. 269.    Argued April 27, 1906.—Decided May 28, 1906.

Under the treaty between the United States and Cuba of December 11, 1902, and the act of Congress of December 17, 1903, imports from Cuba were not entitled to reduction of duties imposed by the tariff act of July 24, 1897, until December 27, 1903, the date proclaimed by the President of the United States and the President of Cuba for the commencement of the operation of the treaty.

After the treaty was amended by the Senate and the amendment accepted by Cuba the time of its going into effect was to be fixed by act of Congress and not as originally fixed by the treaty ten days after the exchange of ratifications.

There is a presumption against retrospective legislation and words in a statute will not be construed as having such effect unless they clearly can have no other effect, and the legislative intent cannot otherwise be satisfied; and in this respect the use in the statute of the future tense must be given weight.

THE question in the case is whether certain sugars which were imported between the twelfth of June and the twenty-eighth of September, 1903, were chargeable with full duties under the tariff act of July 24, 1897, or were entitled to twenty per cent reduction of duties prescribed by that act, under the treaty between the United States and Cuba of the date December 11, 1902, and an act of Congress of December 17, 1903. The answer to the question depends upon when the treaty went into effect, whether upon the tenth of April, 1903, or the twenty-seventh of December, 1903. The appellee contends for the former and the appellant for the latter date. Duties were assessed under the act of 1897 without reduction. Protests were filed and an appeal taken to the board of appraisers, who sustained the collector. The decision of the board was reversed by the Circuit Court. The treaty provided, 33 Stat. 2136, 2142, among other things as follows:

"The President of the United States of America, and the President of the Republic of Cuba . . . have in consideration of, and in compensation for, the respective concessions and engagements made by one to the other as hereinafter recited, agreed and do hereby agree upon the following articles for the regulations and government of their reciprocal trade, namely:

## Article II.

"During the term of this convention, all articles of merchandise not included in the foregoing Article I, and being the product of the soil or industry of the Republic of Cuba imported into the United States shall be admitted at a reduction of twenty per centum of the rates of duty thereon as provided by the tariff act of the United States approved July 24, 1897, or

as may be provided by any tariff law of the United States subsequently enacted."

Article XI was as follows:

"The present convention shall be ratified by the appropriate authorities of the respective countries, and the ratifications shall be exchanged at Washington, District of Columbia, United States of America, as soon as may be before the thirty-first day of January, 1903, *and the convention shall go into effect on the tenth day after the exchange of ratifications,* and shall continue in force for the term of five (5) years from date of going into effect, and from year to year thereafter until the expiration of one year from the day when either of the contracting parties shall give notice to the other of its intention to terminate the same."

. By supplemental treaty signed January 26, 1903, 33 Stat. 2145, it was provided that "the respective ratifications of the said convention shall be exchanged as soon as possible, and within two months from January 31, 1903."

March 19, 1903, the Senate added the following amendment at the end of Article XI: "This convention shall not take effect until the same shall have been approved by the Congress."

On March 31, 1903, ratifications were exchanged. At this date Congress was not in session, but was convened in special session November 9, 1903, and passed on December 17, 1903, 33 Stat. 3, an act entitled: "An act to carry into effect a convention between the United States and the Republic of Cuba, signed on the eleventh day of December in the year 1902." Section 1 provides as follows:

"That whenever the President of the United States shall receive satisfactory evidence that the Republic of Cuba has made provision to give full effect to the articles of the convention between the United States and the Republic of Cuba, signed on the eleventh day of December, in the year nineteen hundred and two, he is hereby authorized to issue his proclamation declaring he has received such evidence, *and thereupon, on the tenth day after exchange of ratifications of such convention* be-

tween the United States and the Republic of Cuba, *and so long as the said convention shall remain in force,* all articles of merchandise being the product of the soil or industry of the Republic of Cuba, which *are now* imported into the United States free of duty, *shall continue* to be so admitted free of duty, and all other articles of merchandise being the product of the soil or industry of the Republic of Cuba imported into the United States *shall be admitted* at a reduction of twenty per centum of the rates of duty thereon, as provided by the tariff act of the United States approved July twenty-fourth, eighteen hundred and ninety-seven, or as may be provided by any tariff law of the United States subsequently enacted. The rates of duty herein granted by the United States to the Republic of Cuba are and shall continue *during the term of said convention* preferential in respect to all like imports from other countries: *Provided,* That while said convention is in force no sugar imported from the Republic of Cuba, and being the product of the soil or industry of the Republic of Cuba, shall be admitted into the United States at a reduction of duty greater than twenty per centum of the rates of duty thereon, as provided by the tariff act of the United States approved July twenty-fourth, eighteen hundred and ninety-seven, and no sugar the product of any other foreign country shall be admitted by treaty or convention into the United States while this convention is in force at a lower rate of duty than that provided by the tariff act of the United States approved July twenty-fourth, eighteen hundred and ninety-seven: *And provided further,* That nothing herein contained shall be held or construed as an admission on the part of the House of Representatives that custom duties can be changed otherwise than by an act of Congress, originating in said House."

The same day (December 17, 1903) the President issued his proclamation, 33 Stat. 2136, which, after setting forth the treaty and the act of Congress and reciting the above facts, together with the fact that ratifications of said convention had been exchanged on March 31, 1903, declared:

"And whereas satisfactory evidence has been received by the President of the United States that the Republic of Cuba has made provision to give full effect to the articles of said convention:

"Now, therefore, be it known that I, Theodore Roosevelt, President of the United States of America, in conformity with the said act of Congress, do hereby declare and proclaim the said convention, as amended by the Senate of the United States, to be in effect *on the tenth day from the date of this my proc-lamation.*"

*The Solicitor General* for the United States, in this case, and in No. 652, argued simultaneously herewith: [1]

The treaty and act were prospective and coterminous. The original stipulation that the treaty was to take effect ten days after exchange of ratifications was superseded by the Senate amendment, ratified and approved by Cuba, that the treaty should not take effect until approved by Congress. The subsequent action of the contracting parties was in accordance with that intent. The act was passed to carry the treaty into effect; its language is prospective. The words "on the tenth day after exchange of ratifications" are said to be retrospective because the President's proclamation after the passage of the act showed for the first time that ratifications had been theretofore exchanged. But the Executive alone knew this; Congress was not advised at the time the act was passed that ratifications had been exchanged March 31, 1903. At that date Congress was not in session, having adjourned March 4, 1903. A special session of the Senate began March 5 and adjourned March 19, the day the resolution amending the treaty was adopted. The President's proclamation of October 10, 1903, convening a special session to consider the treaty, sets forth that the approval of Congress is necessary before the treaty shall take effect; and in his message to that session he refers to ratification without stating when the treaty was

---

[1] *Franklin Sugar Refining Company* v. *United States, post,* p. 580.

ratified or whether ratifications had been exchanged. Both Houses thought that the stipulation as to the exchange of ratifications was superseded by the Senate amendment, and supposed that final step had been deferred until Congress should act.

That Congress did not intend a retroactive effect is clear from the committee reports and debates. The discussion in Senate and House was as to the scope of the treaty-making power and the propriety of granting the proposed reductions in the Cuban tariff. The fact was mentioned that the bill would make an annual reduction of $8,000,000 in duties on imports from Cuba, which would have meant, in case of retrospective operation, a refund of $6,000,000 for the previous nine months. Yet nothing was said about this, and no provision whatever was made.

The treaty and act took effect simultaneously on the tenth day after proclamation. The approval by Congress was conditional: the President was first to ascertain whether Cuba had made provision to give full effect to the convention, issue his proclamation declaring that he had received such evidence, and "thereupon on the tenth day after exchange of ratifications" the new arrangement was to begin. This was clearly within the authority of Congress to do. *Field* v. *Clark*, 143 U. S. 649. The President, although aware of the fact that ratifications had been exchanged, had to construe the law so as to carry into effect the intention of Congress, which was clearly that not only should the new arrangement not begin to operate until Cuba had made due provision on her part, but that ten days' notice should be given before it should take effect, as originally provided in the treaty. The President therefore did the only possible and logical thing under the circumstances.

Even if the approval of Congress and the action of the President were not strictly in accordance with the terms of the treaty, no one but Cuba could take exception. The interpretation and enforcement of such treaty stipulations are

for the determination of the political departments of the Government, and courts will respect their decision. *Foster* v. *Neilson,* 2 Pet. 253; *The Cherokee Tobacco,* 11 Wall. 616; *Whitney* v. *Robertson,* 124 U. S. 190; *Botiller* v. *Dominguez,* 130 U. S. 238; *Fong Yue Ting* v. *United States,* 149 U. S. 698. Cuba has concurred in the action of this Government, and the arrangement was essentially reciprocal. Both the United States and Cuba have put this treaty into effect on the same day to operate prospectively, and there is nothing to indicate that the two governments are not perfectly satisfied that the true intent of the treaty has been observed. The argument, reiterated by our opponents, that one party to the agreement has undertaken to modify it without consulting the other party, is simply disproved by the facts.

The case of *United States* v. *Burr,* 159 U. S. 78, is controlling. There the tariff act of 1894 specifically required its retrospective operation; yet the court looked to the spirit of the law. The doctrine of *United States* v. *Heth,* 3 Cranch, 398 was affirmed; the court held the question was one of intention, and emphasized the rule that tariff laws should have a prospective operation in order that there might be an interval before the act took effect for business to adjust itself to the change, and thus avoid confusion and mischief to the country. Those considerations apply with even greater force in this case, where the retrospective intention does not appear on the face of the statute, but rests on inference, based on an assumption that Congress knew of the exchange of ratifications,—which convicts it of inconsistency in its direction as to proclamation by the President. If Congress knew that ratifications had been exchanged several months before, why say the treaty should take effect on the tenth day after exchange? Congress was evidently anticipating something yet to occur, and intending to give adequate notice to business men.

The Senate resolution requiring approval of Congress was valid and operative. There is an inconsistency between the theory of appellees' protest and their brief. The protest says

that the clause of the treaty stipulating for approval by Congress is inoperative, and yet anticipates the act and relies on it when passed. Now they concede that the amendment was operative and the Senate had power thus to amend. There is no doubt of this. An act of Congress is not necessary to the validity of a treaty, but may be to its taking effect. *Foster* v. *Neilson,* 2 Pet. 253; *United States* v. *Arredondo,* 6 Pet. 691. It is not necessary to determine whether this treaty is self-executing or not, since it in terms stipulates that it shall not take effect until approved by Congress, and Congress in giving its approval enacted the necessary legislation to carry the treaty into execution.

The sugars not actually removed from the bonded warehouse until after December 27, 1903, but for which withdrawal entry had been made and permit to deliver issued prior to that date, were properly held to have been withdrawn before the treaty took effect (sec. 20, Customs Administrative Act, as amended by act Dec. 15, 1902, 32 Stat. 753). There was a constructive withdrawal of the goods. This court has held that goods are to be deemed to have been warehoused from the time of importation, because from that time they are in the custody and control of the Government. *Hartranft* v. *Oliver,* 125 U. S. 525; *Seeberger* v. *Schweyer,* 153 U. S. 609. It therefore follows that the period of warehousing must be held to end when the withdrawal entry is made and a permit to deliver issued, because the goods then cease to be in the custody and control of the Government. This is the only practical rule to adopt, and it has been followed by the Treasury Department from the first in applying the Cuban treaty. T. D. 24,855; T. D. 29,924.

To hold that because liquidation occurred after the treaty became operative the goods were entitled to the benefit of its terms would be to make the date of liquidation and not the date of withdrawal the determining factor, contrary to sec. 20, Customs Administrative Act. The law does not prescribe the time in which liquidation shall be made, but only that, after

liquidating, the collector may not, in the absence of fraud or protest, reliquidate after a year from the date of entry. Act June 22, 1874, sec. 21, 18 Stat. 186; *Abner Doble Co.* v. *United States,* 119 Fed. Rep. 152; *United States* v. *De Rivera,* 73 Fed. Rep. 679; *Gandolfi* v. *United States,* 74 Fed. Rep. 549. And see *Merritt* v. *Cameron,* 137 U. S. 542, 549–551. The date of liquidation is important only in its bearing upon the time for making protest and reliquidation. There is no provision in the treaty or the act requiring the liquidation or reliquidation of goods previously entered in accordance with its terms. This shows that the treaty and act were not intended to be retroactive in any respect. *United States* v. *Burr, supra,* citing *Barney* v. *Rickard,* 157 U. S. 352. The merchandise was liquidated as entered, there was no change in the classification, the original assessment of duty was right, and the final liquidation was the same. The estimated duties paid at the time of withdrawal are the duties.

*Mr. John G. Johnson,* with whom *Mr. John E. Parsons* and *Mr. H. B. Closson* were on the brief, for appellee in this case and for appellant in No. 652, argued simultaneously herewith.[1]

There was also a separate brief by *Mr. Edward S. Hatch* and *Mr. J. Stuart Tompkins* in behalf of certain importers having similar interests.

By the convention itself, the term of its duration was fixed, viz., five years from the tenth day of April, 1903, which date was ten days after that of exchange of the ratifications by the respective governments.

This contention rests upon the unequivocally expressed provision that "the convention shall go into effect on the tenth day after the exchange of ratifications, and shall continue in force for a term of five years from the date of going into effect."

The treaty, as made by the respective plenipotentiaries, after execution by them, required the confirmation of the

---

[1] *Franklin Sugar Refining Company* v. *United States, post,* p. 580.

Presidents of the respective governments, and of the Senates of each county.

Until these confirmations, there could be no exchange of ratifications, and of course it was necessary to provide that it should not go into effect until such exchange.

As originally drafted, the convention must have failed altogether, because of the inability to exchange ratifications on or before the thirty-first day of January, 1903. The supplemental convention which was entered into, was requisite to save such failure; but it still remained necessary the exchange should take place on or before the thirty-first day of March, 1903.

There was an obvious reason why a limit of time for commencement of the reduction was fixed. The principal product which would be imported into the United States from Cuba would be sugar. The negotiations for the treaty were conducted, we may assume, in anticipation of the exportation to, and importation into, the United States, of the crop for 1902. In the ordinary course of trade, this crop would begin to be imported in February, 1903, the importations being at their maximum in April, and ceasing substantially on the first day of July.

An extension of the date to December, 1903, would have lost to Cuba the benefit of a reduction upon a crop which was undoubtedly in the minds of both the contracting parties.

Of course we must deal with the effect of words inserted, at the instance of the Senate of the United States, in accordance with the report of its Committee on Foreign Relations; providing that "This convention shall not take effect until the same shall have been approved by the Congress."

Whatever may be urged as to the interpretation of the convention, with these words inserted, it cannot be urged, with conviction, that the intent was to alter, or to do anything other than to guard against the possibility of its becoming non-enforceable because of its affecting a tariff duly enacted by the Congress of the United States.

One of the provisos, inserted in the act, discloses the jealousy of the House of Representatives of its right, claimed by it to exist, that customs duties could not be changed other than by "an act of Congress originating in said House."

The Senate, it may be assumed, was equally jealous of its right of approval of treaties without any consent of the House of Representatives. We think it may be asserted, confidently, it was not intended by the Senate, that Congress should approve the treaty, but simply that it should give approval to what might be necessary, in the way of legislation, in removing all possibility of question of enforcement in the United States, of its conditions.

The Senate knowing it had been provided the term should commence "on the tenth day after the exchange of ratifications," did not alter said provision; but knowing, also, that a question existed as to the right to make any treaty which altered a revenue law, it directed that though the term should continue as prescribed, the convention itself should not be effective until approved by the Congress.

No doubt as to the actual intention of the Senate can exist, in view of the explanation of Senator Bacon, and of what was said in its committee's report as to the ratification of certain reciprocity treaties to which we have already referred. This report shows that the Senate considered the words, "prohibiting the taking of effect until the same shall have been approved by Congress," as the equivalent of the words, "shall not take effect without the approval of Congress."

It was not intended by the Senate, by the insertion of these words, to affect the exchange of ratifications. It was evident that if this should not take place on or before the thirty-first day of March, 1903, the convention would fall, by its own terms. Knowing that the ratifications must be thus exchanged, it was obvious the term must commence anterior to the time when Congress could act, inasmuch as it had adjourned, the Senate being in session under a special call.

We must read article XI, it is true, with the words we are

considering added, but we must read it as a whole, not simply the added words. The rules of construction require that so far as may be, all parts of an agreement shall be regarded. If it had been intended the added words should repeal those first used, it would have been so said. Presumably the original words were meant to continue to have effect, because they were allowed to remain, without alteration.

An interpretation can be made which will render the whole of the article effective—that for which we contend—holding the term to continue without alteration, but the convention itself not to have been a binding obligation until something had been done by Congress by way of legislation, necessary, or at least deemed desirable.

In other words, when the Senate said: "The treaty should not take effect until the same shall have been approved by the Congress," it meant only that: "This treaty shall not take effect unless it shall be approved by the Congress."

In determining the meaning and effect of the act of December 17, 1903, it is necessary to bear in mind the fact that it is the meaning of the convention, not that of Congress, as embodied in this act, which we must ascertain, the first being the act of the two contracting parties, whilst the latter emanates only from one.

No construction will be given to the act which, in any way, will affect the contract. It was in the power of Congress to refuse to legislate by way of amendment of the tariff act, but it possessed no other power in the matter.

The beginning, and the end, of the act, was the removal of any bar in the way of a question as to the right, in the United States, to make valid a treaty, which provided for the payment of duties upon imports, less than those which had been prescribed by act of Congress.

In the case of the New York importations, as there was a suspension of the liquidation until a date subsequent to December, 1903, the ultimate liquidation was required to be made under a reduction at that time conceded to be in force.

The effect of the importers' protest and appeal from the decision of the collector to the board of general appraisers was to suspend the liquidation of the duties upon merchandise until after its disposition of the appeal; which was not made until April, 1904, months after the Cuban treaty had become the law of the land.

This principle is the necessary result of the language of the Customs Administrative Act and the revisory powers with which it endows the board of general appraisers. Act of June 10, 1890, § 14. See also Attorney General's argument in *United States* v. *Goldenberg,* 168 U. S. 95.

If, while the importers' protest and appeal were pending *sub judice,* either before the board of appraisers or before the Circuit Court, and while the duties therefore still remain unliquidated, so much of the statute as imposed upon these imports more than eighty per cent of the general tariff rates was repealed, as of a date prior to that of the importation, it was the duty both of the board of appraisers and of the Circuit Court to give effect to the repeal and to reverse the collector's decision, even though correct when made. 26 Am. & Eng. Ency. of Law, 2d ed., 748. *United States* v. *Schooner Peggy,* 1 Cranch, 103.

While the importers' protest and appeal were still *sub judice* before the board of appraisers, and before the duties had been liquidated; so much of the statute as imposed more than eighty per cent of the regular duties upon these imports was repealed, and the repeal by its very terms took effect as of a date prior to the date of the importation.

It was not until April 28, 1904, that the board of appraisers acted upon the importers' protest and appeal. In the meantime the Cuban treaty upon its approval by Congress on December 17, 1903, four months before, had become the law of the land. Article II of that treaty provided that "during the term of this convention" all Cuban sugar should be admitted at a reduction of twenty per cent; and as to the term of the convention that it should "go into effect on the tenth day after

the exchange of ratifications, and continue in force for the term of five years from the date of going into effect." The tenth day after the exchange of ratifications was April 10, 1903. The sugars were imported in June, July, August and September, 1903.

In the case of the Philadelphia importations, the liquidation was not made until after December, 1903, and was therefore required to be made in accordance with the tariff act as then in force. What has just been said applies with greater force to these importations where there was no liquidation until after the convention was concededly in effect.

After stating the case as above, MR. JUSTICE McKENNA delivered the opinion of the court.

The treaty as drafted and presented to the Senate provided for an exchange of ratifications at Washington as soon as might be before the thirty-first day of January, 1903, and should "go into effect on the tenth day after the exchange of ratifications." A supplemental convention became necessary, and an exchange of ratifications was provided to be "as soon as possible and within two months from January 31, 1903." But subsequent to that date, to wit, March 19, 1903, the Senate added the amendment: "This convention shall not take effect until the same shall have been approved by the Congress." Between the treaty, therefore, and the amendment there was an emphatic difference. The date at which the instrument should go into effect was changed. It cannot be said that the treaty provision related to time and the amendment to sanction merely and adopted the time of the treaty. To do this would be to interpret the words of the treaty one way and the same words in the amendment another way. We start, then, with the proposition that not the treaty, but the act of Congress, was to fix the date that the treaty should take effect. What date Congress fixed is the question to be considered. It was certainly competent for Congress (with the consent of Cuba)

to have given the treaty retrospective, immediate or prospective operation. Which did Congress do? And in reply we are to remember there is a presumption against retrospective operation, and we have said that words in a statute ought not to have such operation "unless they are so clear, strong, and imperative, that no other meaning can be annexed to them, or unless the intention of the legislator cannot be otherwise satisfied." *United States* v. *Burr,* 159 U. S. 78. On the other hand, it must be admitted that there are words in the act of Congress which, if not of themselves, yet in connection with events, may be said to look to a retrospective operation. It is not, however, an unusual judicial problem to have to seek the meaning of a law expressed in words not doubtful of themselves, but made so by circumstances or the objects to which they come to be applied.

Both the treaty and the act of Congress concern tariff duties, and "the usual course in tariff legislation," we have said, "has been, inasmuch as some time is necessary to enable importers and business men to act understandingly, to fix a future day at which the statutes are to become operative." *United States* v. *Burr, supra.* And these remarks have application here. The treaty, it may be admitted, was intended as a beneficial concession to Cuba. But conditions in the United States were also to be considered, and we cannot assume that this would have been overlooked by Congress when legislating. It is true, as urged by appellant, that the act of December 17 deals entirely with importations from Cuba, but it is those which would have the most disturbing effect, and on account of which business in like products would have to be accommodated. These as well as the considerations urged by the appellant must be kept in mind in seeking the meaning of Congress, and we repeat that, under the Senate amendment, it is the meaning of Congress, not the meaning of the convention independent of that of Congress, we are to ascertain. It was open to Cuba to reject the amendment; it was open to Cuba to reject the legislation. If she chose to accept both they became her contracts.

Turning to the act of December 17 we find it expressed in the simple future tense, and this must be given weight. *United States* v. *Goldenberg*, 168 U. S. 95, 102. So far as the text of the act itself is concerned, all of its parts accord; all of its provisions are prospective but one. That pertained to the then present, the date of the act. It provided that all products which were imported free should continue to be admitted free. The provision is "all articles . . . which *are now* imported . . . free of duty *shall continue* to be so admitted. . . ." This accords with and reinforces the prospective provisions, and was apparently used with deliberate and provident intention, making the act provide for the present and future, excluding the past, certainly not expressing it. Passing from the text of the act, an element of confusion appears. Ratifications had been exchanged between the United States and Cuba on March 1, 1903. The text of the act provides "that whenever the President *shall* receive satisfactory evidence that the Republic of Cuba has made provision to give full effect to the article of convention . . . he is hereby authorized to issue his proclamation declaring that he has received such evidence, and *thereupon*, on the tenth day after exchange of ratifications of such convention, . . . *and so long as said convention shall remain in force*, all articles of merchandise being the products of the Republic of Cuba, which are now imported . . . free of duty, shall continue to be admitted free of duty, and all other articles . . . shall be admitted at a reduction of 20% of the rates of duty thereon as provided in the tariff act of the United States approved July 24, 1897. . . ." The words of the act, therefore, refer manifestly to an event to occur, which seemingly had already occurred, and upon such event, it is contended, the treaty, by its own terms and by the act of Congress, took effect, to wit, "the exchange of ratifications" of the convention. To this the Government replies that Congress, not being in session at the time, was ignorant that ratifications had been exchanged, and framed its legislation with the view that some further provision by Cuba was neces-

sary. If we may not accept the explanation of Congress's ignorance it is not unreasonable to suppose that Congress considered it was still open to Cuba to accept or reject the treaty, and to make sure of her acceptance before the treaty should go into effect in the United States. This view satisfies completely the text of the act. We cannot suppose that if Congress intended to give retrospective operation to the act it would have used words that expressed the contrary. The day at which the treaty should operate was important, and would necessarily be ever present in mind, and it was easy of expression. Future time and past time are directly opposite, and by no inadvertence or intention can we believe or suppose that Congress, having in mind and purpose the distinction between the past and the future, should use language that expressed the one while it meant to provide for the other.

There is another important fact. The treaty was a reciprocal arrangement and intended to go into effect coincidently in the United States and Cuba. The two nations provided for this. On the day the President approved the act of Congress he issued his proclamation declaring that the treaty should go into effect on the twenty-seventh day of December. On the seventeenth of December the President of Cuba also issued his proclamation, stating that Congress had approved the treaty in accordance with the requirements of Article XI, and declaring that the treaty should take effect in Cuba on the day named in the proclamation of the President of the United States—December 27, 1903. This coincident operation is of the very essence of the convention. It would indeed be anomalous if a treaty which provided for reciprocal concessions should be in operation in one nation eight months before it was in operation in the other. And this is not adequately answered as appellee answers it, by saying that the President of Cuba and the President of the United States were both mistaken as to the date of the operation of the treaty, and their mistake could not affect the rights of importers. Certainly not if a mistake could be conceded. But the action of the Presidents is proof against

the existence of mistakes. It shows the understanding of the executives of the two countries and affords confirmation of the view that Congress contemplated action subsequent to its legislation to put the treaty into effect.

*The judgment of the Circuit Court is reversed and the case remanded with directions to affirm the order of the Board of General Appraisers.*