**BRYSON et al. v. HINES, Director General of Railroads, et al.**

(Circuit Court of Appeals, Fourth Circuit. July 12, 1920.)

No. 1790.

1. Carriers ⬤⟿306(1)—Builder of unsafe railroad, accepted and operated by government, liable for injuries to soldiers transported.

One who built a railroad on a military reservation, knowing that it would be used for the transportation of troops, and that it was so poorly constructed as to be dangerous, is liable for injuries to soldiers caused by such negligent construction, though the government had accepted the railroad and was operating the train on which the soldiers were riding.

2. Carriers ⬤⟿306(1)—Exemption of government from suit does not affect liability of joint tort-feasor.

The exemption of the government from suit for injuries to a soldier transported over an unsafe railroad, built by a railroad company on a

---

⬤⟿For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

military reservation and accepted and operated by the government, does not affect a liability of the railroad company.

3. **Railroads ⊙⇒5½, New, vol. 6A Key-No. Series—Director General's circular, requiring compensation under War Risk Insurance Act for injuries, did not divest accrued rights.**

The circular of the United States Railroad Administration, providing compensation for soldiers injured or killed on the railroads under the War Risk Insurance Act (Comp. St. §§ 514a–514j), and not by claim against the administration, could not divest a right of action against a railroad company for the death of a soldier, which had accrued before the circular was published.

4. **Carriers ⊙⇒291—Haste, excusing negligent construction of railroad operated by government, cannot be assumed.**

In an action against a railroad company for negligence in constructing an unsafe railroad, accepted and operated by the government for carrying troops on a military reservation, where there was no proof that the government required the construction in such haste as to excuse the negligence, the railroad cannot be relieved from liability on that ground, as it cannot be assumed as a matter of law that the government required the construction of a dangerous track.

5. **Railroads ⊙⇒5½, New, vol. 6A Key-No. Series—Director General's negligence held question for jury.**

In an action for the death of soldiers, caused by derailment of a train, evidence that the track was so bad that cars were derailed on it every day, and testimony by an experienced witness that on such a track the speed should not have been over half the speed at which the train was operated, is sufficient to take to the jury the question of the Director General's negligence.

6. **Railroads ⊙⇒5½, New, vol. 6A Key-No. Series—Director General's circular, requiring compensation under War Risk Insurance Act, instead of action for injuries, not retroactive.**

If the circular of the Director General of Railroads, providing for compensation under the War Risk Insurance Act (Comp. St. §§ 514a–514j), for injury to soldiers during transportation, was sufficient to withdraw the consent of Congress to suits against the Director General for such injuries, it does not prevent recovery against him for injuries caused before it was issued, since it does not express an intention that it should have a retroactive effect, and such effect will not be given by construction, especially where it would result in injustice.

7. **Railroads ⊙⇒5½, New, vol. 6A Key-No. Series—Director General not liable for negligence of military officers.**

Where the arrangement of the cars in a troop train was entirely within the control of the military officers, the Director General cannot be held liable for negligence in putting light wooden cars between heavy steel cars.

In Error to the District Court of the United States for the Western District of North Carolina, at Asheville; James E. Boyd, Judge.

Separate actions by A. H. Bryson, as administrator of Walter C. Bryson, deceased, and by Emma C. Swann, as administratrix of Philetus C. Swann, deceased, against Walker D. Hines, Director General of Railroads, and the Atlantic Coast Line Railroad Company, tried together by consent. Judgment for defendants on directed verdict, and plaintiffs bring error. Reversed.

Zeb F. Curtis, of Asheville, N. C., D. W. Robinson, of Columbia, S. C., and James J. Britt, of Asheville, N. C. (Harkins & Van Winkle, of Asheville, N. C., on the brief), for plaintiffs in error.

⊙⇒For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

P. A. Willcox, of McRae, Ga., A. L. Hardee, of Wilmington, N. C., and Thomas S. Rollins, of Asheville, N. C. (Charles F. Patterson, of Washington, D. C., and Martin, Rollins & Wright, of Asheville, N. C., on the brief), for defendants in error.

Before PRITCHARD and WOODS, Circuit Judges, and ROSE, District Judge.

WOODS, Circuit Judge. On May 10, 1918, Walter C. Bryson and Philetus C. Swann, soldiers of Company A, 321st Regiment of Infantry, were killed in Camp Jackson Military Reservation by derailment of a train on which they were being transported under military orders. In separate actions for damages, tried together by consent, their administrators charge that the proximate cause of the derailment was negligence of the Atlantic Coast Line Railroad Company and the Director General of Railroads.

There was abundant evidence of acts of negligence alleged in the complaints, but the District Court directed a verdict for the defendants; one of the grounds being that the right of recovery against the railroad company and the Director General for the injury or death of a soldier had been supplanted and taken away by the following circular:

"United States Railroad Administration, Division of Law.

"Washington, October 25, 1918.

"Circular No. 4.

"Attention is directed to the act of Congress entitled 'An act to amend an act entitled "An act to authorize the establishment of a Bureau War Risk Insurance in the Treasury Department,"' approved September 2, 1914, and for other purposes, approved October 6, 1917, Public Document No. 90, Sixty-Fifth Congress (H. R. 5723).

"This act establishes a system for compensating officers and enlisted men and women nurses of the Army and Navy Nurse Corps, when employed in active service under the War or Navy Departments of the government.

"In case of railroad accidents, in order to avoid confusion and to effectuate a proper and uniform handling of the compensation claims of such injured and disabled persons who are entitled to receive compensation under the War Risk Act, upon the happening of any accident causing death, disablement or of injury to any officer, enlisted man, or member of the Army or Navy Nurse Corps (female) occurring on any line of railroad under federal control, the General Solicitor will immediately notify J. H. Howard, Manager, Claims and Property Protection Section, Division of Law, Southern Railroad Building, Washington, D. C., giving the name and emergency address of the dead or injured person, his or her number, rank, and routing, and in the case of injured persons, his or her present address.

"Such injured officers and enlisted men and members of the Army and Navy Nurse Corps (female) will be remitted to their claim for compensation through the War Risk Bureau and will not receive any payment through the Railroad Administration.

"No claim for damages for injuries occasioning death or disablement of such persons should be recognized or entertained. The circumstances surrounding accidents should be investigated as heretofore and report filed.

"The General Solicitor will notify general claim agents of this circular who will in turn notify all claim agents.

"John Barton Payne, General Counsel.

"Approved: W. G. McAdoo, Director General of Railroads."

We first give attention to the effort of defendants' counsel to sustain the instruction that no negligence was proved which can be imputed to either of the defendants.

Atlantic Coast Line Railroad Company constructed the road from Simm's Station on its line into Camp Jackson. The sole purpose of construction was the transportation of troops and supplies and munitions for the construction and maintenance of the camp. The Southern and Seaboard Railroads paid part of the cost, under bills rendered by the Coast Line. This construction was completed before the Director General took charge of railroads under the President's proclamation of December 26, 1917. The portion of road which was inside the limits of Camp Jackson, on which the accident occurred, was acquired by the government, either by purchase from the Atlantic Coast Line Railroad Company or under a contract with that railroad company for its construction as a part of the reservation. On demand for cars by the military authorities, they were carried into the reservation and brought out by an engine of the Coast Line in charge of one of its engineers. Within the reservation the arrangement of the cars on the track and the entrainment of troops were under exclusive control of the military officers in charge. The maintenance and repair of the track was in exclusive control of the War Department.

The evidence tended strongly to show that the accident was due chiefly to the negligent construction by the Coast Line of a grossly and obviously unsafe track, and the negligence of the government in accepting the track and in failing to make it safe after acquiring it. Col. Frank, quartermaster, testifying to the cause of the accident, said:

"I attribute it to the light class of rail that was put in there and accepted by the quartermaster whom I relieved. I never would have accepted the track, if I had been the quartermaster when it was constructed. After the accident, I examined the track and found it badly torn up—a rail broken, a few angle bars broken, a few spikes cut off. From my examination as to the cause of the accident, I would say poor construction. I know a little bit about engineering, and I think it is about the poorest piece of railroad construction I ever saw in my life. The trestle was built on a grade with an acute curve. That is why I asked for heavier rails, trying to make it safe. I also needed tie plates, angle bars, and angle braces. About six weeks before the accident, I had removed practically all of the ties at that place, one at a time, by the railroad crew, and put them back in, putting as many as five or six spikes in each tie trying to hold it down until I could get heavier equipment, trying to prevent an accident, which I felt sure would happen some day. I had the railroad crew to go over the track after every three passenger trains went out. They were light angle bars used on 35-pound rail."

Other witnesses gave like testimony as to the unsafe construction and bad condition of the track, and the consequent frequent derailments. Col. Frank also testified that he wrote in vain several times to the Quatermaster Corps in Washington, stating the dangerous condition of the track, warning of impending accident, and asking that the road be made safe.

[1] For this negligence of the War Department, of course, there can be no recovery. The defendants maintain that although the road as constructed may have been an obvious menace to the life of every

person transported over it there is no liability on the builder for loss of life due to its negligence in that respect; for the reason that it was accepted and operated by the government and that from the time of acceptance the government alone was responsible. For this defendants rely on the general rule than one injured by a dangerous or defective instrumentality in the hands of another person cannot recover against a third person, who sold or furnished it, because of lack of privity of contract. Savings Bank v. Ward, 100 U. S. 195, 25 L. Ed. 621. Cases citing this case and applying the rule are collated in Rose's Notes, 25 L. Ed. 871.

But the opposite rule applies where the person selling or furnishing the article or instrumentality knows it to be dangerous, and also knows it will be used by other persons not aware of the danger; and this rule holds, even if the person to whom the article was sold knows the danger. Waters-Pierce Oil Co. v. Deselms, 212 U. S. 159, 179, 29 Sup. Ct. 270, 53 L. Ed. 453; O'Brien v. American Bridge Co., 110 Minn. 364, 125 N. W. 1012, 32 L. R. A. (N. S.) 980, 136 Am. St. Rep. 503, and numerous authorities cited; Huset v. J. I. Case Threshing Machine Co., 120 Fed. 865, 57 C. C. A. 237, 61 L. R. A. 303. In such case the additional tort of the buyer in concealing the danger does not cancel that of the seller; the person injured has his remedy against two wrongdoers, instead of one.

According to the testimony the Atlantic Coast Line Railroad Company constructed and turned over to the government a track which it could not fail to know was exceedingly dangerous, and which it certainly knew was to be used to transport thousands of soldiers. There is not a particle of evidence that the soldiers killed knew of the dangerous nature of the track. But it would make no difference if they had known, because the builder of the road knew their knowledge would avail nothing; for it knew the controlling fact that the soldiers who were to be transported had no power to reject the track, or to have it repaired or reconstructed, or to refuse to travel over it. Does not the argument come clearly to this? The railroad company, in breach of its duty, constructed and delivered to the government an unsafe track, which it knew would endanger the lives of soldiers forced to travel upon it, yet this breach of duty was canceled by the breach of duty of officers of the government in using the track in an unsafe condition. This amounts to saying that an original wrongdoer is released when another takes up and continues the wrong. The statement of the argument carries its own refutation, and it is disposed of by the Supreme Court in Waters-Pierce Oil Co. v. Deselms, supra, and other authorities cited.

[2] The exemption of the government from suit does not affect the liability of the railroad company.

[3] It follows that, if the negligent construction described in the testimony was a proximate cause of the accident, the plaintiffs had a vested right of action against the railroad when it occurred on May 10, 1918. It is admitted that if there was such a vested right of action it was not affected by Circular No. 4. This conclusion would result in a reversal of the judgment.

[4] It was earnestly pressed at the argument that the Atlantic Coast Line was not responsible for negligent construction because of the haste required of it by the government. This defense is without support either in the allegation of the answer or the testimony. We cannot assume as a matter of law that the government required of the Coast Line the construction of a track which imperiled the life of every soldier who passed over it.

[5] We think there was also evidence of actionable negligence in the operation of the train by the Director General. According to the evidence the train was running at a speed of from 8 to 10 miles an hour, and this was the usual speed. There was evidence to the effect that the track was in such bad condition that two or three cars were derailed on it every day. One witness of long experience on railroads testified that on such a track the speed should not have been over 4 to 6 miles an hour. It was therefore for the jury to say whether the speed of the train was high enough to be negligent.

[6] As already observed, Circular No. 4 could not take away any cause of action for the negligence of the Atlantic Coast Line Railroad Company, for it existed and was a vested right before that circular was issued. The right of action had also accrued against the Director General under the federal statutes and proclamations of the President, if the train was negligently run. As the Director General was an officer of the government, the right of action was in effect against the government, and was dependent upon the permission and grant of the government found in these statutes and proclamations. This permission and grant could, of course, be withdrawn at any time before the judgment. We do not discuss the question whether Circular No. 4, issued by the Director General, had the force of an act of Congress, withdrawing the grant or permission to sue him, for the reason that, if the Director General had such power and exercised it, we do not think he expressed in the circular the intention that it should have the retroactive effect of destroying rights of actions which had already accrued. Statutes are never construed to act retrospectively, unless the legislative effect is clearly expressed or necessarily implied. When retrospective operation of the statute would result in injustice, the presumption against such a legislative intent is still stronger. United States v. Burr, 159 U. S. 78, 15 Sup. Ct. 1002, 40 L. Ed. 82; Osborn v. Nickolson, 13 Wall. 654, 662, 20 L. Ed. 689; United States v. American Sugar Refining Co., 202 U. S. 563, 577, 26 Sup. Ct. 717, 50 L. Ed. 1149; 36 Cyc. 1205. There is nothing in the circular to indicate that it was intended to apply to injuries and deaths of soldiers which already had been inflicted, and it would have been a manifest hardship to take away the right of action from soldiers who at the time of boarding the train and incurring the risk had the statutory assurance of the protection of liability of the Director General for death or injuries due to the negligent operation of the train.

[7] We think there can be no recovery for negligence in putting light wooden cars between heavy steel cars, in consequence of which the wooden cars were crushed by the derailment. The officers of the

army had entire control of the arrangement of the cars, and for their negligence in this respect there was no right of action against either of the defendants.

Reversed.