HEISE v. DAVIS, Agent of Railroads, et al. (two cases).

(Circuit Court of Appeals, Fourth Circuit. July 7, 1921.)

Nos. 1889, 1890.

Carriers ⬥⟿306 (1)—Neither railroad company nor Director General responsible for dangerous condition of track laid in a camp by the military authorities.

Neither a railroad company, which built a branch from its line into a military camp, nor the Director General, who afterward took over the operation of its road, *held* liable for the death of soldiers, caused by the derailment of a car within the camp, due to the defective and dangerous condition of the track, where the military authorities had previously taken charge of and were in exclusive control of such track and had changed it at the place of the accident and substituted lighter rails, insecurely fastened.

---

⬥⟿For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

In Error to the District Court of the United States for the Eastern District of South Carolina, at Columbia; Henry A. Middleton Smith, Judge.

Action at law by T. Alex Heise, administrator of Marion O. Hawkins, deceased, and also as administrator of William Edgar Lowery, deceased, against James C. Davis, Agent of Railroads, and the Atlantic Coast Line Railroad Company. Judgments for defendants, and plaintiff brings error. Affirmed.

D. W. Robinson, of Columbia, S. C., for plaintiff in error.

Douglas McKay, of Columbia, S. C., and P. A. Willcox, of Florence, S. C. (A. L. Hardee, of Florence, S. C., on the brief), for defendants in error.

Before KNAPP and WOODS, Circuit Judges, and WATKINS, District Judge.

KNAPP, Circuit Judge. These cases involve the same facts; they were tried together and may be disposed of in one opinion.

In June, 1917, the Atlantic Coast Line Railroad Company built a branch from its main line at Simms, S. C., into the military reservation known as Camp Jackson. This branch, after crossing a trestle at the south boundary of the camp, ran nearly straight in a northerly direction for about 100 feet, and then curved sharply to the east for a distance of some 700 or 800 feet. It was called track No. 1. Not far from the trestle a switch was put in, which also curved to the east, parallel with, but much shorter than, No. 1. It does not appear that this switch, called track No. 2, had anything to do with the accident presently to be described. These tracks, aggregating about 1,000 feet, were all laid with 70-pound rails, and were the only tracks laid in the camp by the railroad company. On the 28th of June they were turned over to the military authorities, who thereupon assumed and thereafter exercised complete and exclusive control of the same and of all operations thereon.

On the 10th of May, 1918, a troop train was moving out from track No. 1 towards the trestle. At the curve of that track a car filled with soldiers was derailed and dragged along to the trestle, where it fell, bottom up, into the ravine below. Several of the soldiers were killed, among them Hawkins and Lowery, plaintiff's intestates.

The plaintiff seeks to recover in these suits on the theory that the original construction of the track, at the point where the derailment occurred, was so faulty and dangerous as to charge the railroad company with continuing liability for any injury resulting therefrom, the theory sustained by this court in Bryson, Adm'r, v. Hines (C. C. A.) 268 Fed. 290, 11 A. L. R. 1438, a case arising out of the same accident. In that case we said:

"It follows that, if the negligent construction described in the testimony was a proximate cause of the accident, the plaintiffs had a vested right of action against the railroad when it occurred on May 10, 1918."

But the evidence in this case, while permitting the inference of negligent construction in the first instance, shows that the original track,

at and on both sides of the place where the derailment happened, was reconstructed by the military authorities shortly after they took possession; and this evidence is so definite and circumstantial as to put the fact beyond reasonable doubt. Mahone, the chief engineer of the construction company employed to do the work, and under whose personal supervision it was performed, says that early in July, 1917, the track leading in from the trestle was extended in a straight line "on up through the camp," but with 56-pound rails; that track No. 1 was connected at the curve with "a frog and switch points of 56-pound rail"; that the Coast Line had put in 70-pound rails, and that "to make the 56-pound rail and the 70-pound rail fit, I changed the lead from the switch points to behind the frog point"; that he took out the 70-pound rail south of the frog and "put in 56-pound for about 66 or 70 feet, so as to make it run 56-pound rail to the switch point"; that he shifted the track at the frog, "from nothing in some places to about a foot or a foot and a half in the middle," on account of the old frog that was used, "which did not fit the curve and the angle that was necessary there, and made a kink in the track"; that the kink was "placed in my straight track, instead of in the Coast Line No. 1 track," but the latter was "thrown a little bit to the north or northwest, to ease that curve off as much as possible"; that he did not have sufficient angle bars or bolts, and so used strap iron in place of angle bars; that none of the material was furnished by the Coast Line, and that his construction "was distinct and different from Coast Line construction." And referring to the blueprint in evidence, and the point designated thereon as the point where the accident happened, he said that it "was in the lead which I changed from 70 to 56 pound rail; it was the second joint north of the switch, or the second joint south of the frog in the west rail of track No. 1."

This is fully confirmed by Col. Corkran, the military officer in charge of transportation within the camp, who personally directed the making up of the train in question, was present when it pulled out, gave the signal for it to start, and saw the derailment. He says it "happened at the second joint from the switch point; also the second joint from the frog. The rail at this point is 56 pound."

We find no contradiction of this testimony, and no proof which would warrant the jury in finding the facts to be otherwise. Col. Frank, the plaintiff's principal witness, did not go to the camp until the 3d of September, and the condition of the tracks at that time, at and near the place where the accident happened, must have been brought about in the main by the changes which Mahone had made some weeks before. For he attributes that condition "to the light class of rail that was put in there and accepted by the quartermaster whom I relieved"; and speaks of repeatedly "asking for 75-pound rails, tie plates, braces, etc., to make a safe track in there." But surely he would not have wished to substitute 75-pound rails for the 70-pound which the Coast Line had unquestionably laid; the difference in weight is altogether too slight to justify a change on that account. The "light class of rail," therefore, could have been no other than the 56-pound rail which Mahone had put in along where the derailment occurred.

Col. Frank also says that about six weeks before the accident he had removed practically all of the ties at that place, one at a time, and put them back in with five or six spikes in each tie, "trying to hold it down until I could get heavier equipment, trying to prevent an accident, which I felt sure would happen some day."

Furthermore, it is not shown that the original construction by the Coast Line had the specific defects to which the witnesses on both sides impute the accident. Davis, the only witness for plaintiff who saw the tracks before they were taken over by the War Department, says it was "poor construction," laid on the ground, "small irons," no ballast, "looked as if it was just laid temporarily to shove cars in for unloading purposes." But this does not dispute the testimony of Pleasants, the Coast Line engineer in charge of the work, that the rails used were all 70-pound rails, the standard rail of the Coast Line, and that they were properly bolted together with 70-pound angle bars; nor the testimony of De Berry, track foreman under Pleasants, that "we put down 70-pound rail, and the usual cross-ties and angle bars and spikes, just a few tie plates, not enough to put on all, so one on every other tie." But when the military authorities extended the straight track and switched No. 1 into it, as above described, using 56-pound rails, Mahone testifies that he did not have enough bolts and angle bars to replace the construction of the Coast Line, that in some instances he put in but one bolt in each rail—that is, two bolts in a four-bolt angle bar —and that instead of angle bars he had to use strap iron. And Capt. Felder, conductor of the train, a witness for plaintiff, says:

"After the derailment I examined and found that a wheel of a coach mounted the rail at the joint. The angle bar and bolts at this joint was loose, and there was only one bolt in the angle bar when there should have been four."

This and other testimony of similar import convinces us that the defendants are in no wise responsible for the accident under review. The domination of the military authorities throughout the camp was absolute to the last detail, and neither the Atlantic Coast Line nor the Director General was permitted the slightest interference. For any negligence of the War Department, therefore, in respect of the construction and maintenance of the tracks, the speed of the train, or the position in the train of the wooden coach in which the soldiers were riding, there can be no recovery. Bryson, Adm'r, v. Hines, supra. And we think it clear, in view of the evidence above recited, that no causal relation was shown between the original construction by the Coast Line, however defective or unsafe it may have been, and the derailment which occurred nearly a year afterwards. When account is taken of the extension of straight track and necessary switch connection with track No. 1, the removal of the 70-pound rail laid by the railroad company and substitution of much lighter rail, the change in the curve of No. 1, the different type of construction, the obviously dangerous condition of the newly laid tracks from lack of bolts, angle bars, tie plates, and spikes, and the constant use of those tracks in that condition for eight months or more, it seems impossible to say in reason that anything done or not done by the Coast Line in June, 1917,

was the proximate cause or a proximate cause of the accident that happened in the following May.

The facts developed in these cases are entirely different from those presented in the Bryson Case, and we are of opinion that they entitled the defendants to a directed verdict.

Affirmed.