Booth, Chief Justice,
delivered the opinion of the court: The defendant’s demurrer to plaintiff’s petition is directed to two defenses in law, either of which, if sustained, is sufficient to warrant a dismissal of plaintiff’s petition.
The plaintiff, a New York corporation, is engaged in the business of buying, importing, manufacturing, and selling *297 cigars, cigarettes, and tobacco products in various forms. From 1923 to 1927 the plaintiff imported from Cuba, through the port of New York, large consignments of the above merchandise, about which there is no dispute. The importations were accomplished in the usual manner and the plaintiff complied with the orders, regulations, and directions of the Collector of Customs and the Treasury Department. At the time the importations were accomplished there was in full force and effect a commercial treaty between the United States and Cuba (33 Stat. 2136) concluded December 11,1902, the pertinent articles of which we quote:
“Art. I. During the term of this convention, all articles of merchandise being the product of the soil or industry of the United States which are now imported into the Republic of Cuba free of duty, and all articles of merchandise being the product of the soil or industry of the Republic of Cuba which are now imported into the United States free of duty, shall continue to be so admitted by the respective countries free of duty.
“Art. II. During the term of this convention, all articles of merchandise not included in the foregoing Article I and being the product of the soil of industry of the Republic of Cuba imported into the United States shall be admitted at a reduction of twenty per centum of the rates of duty thereon as provided by the tariff act of the United States approved July 24,1897, or as may be provided by any tariff law of the United States subsequently enacted.
^ ‡ ‡ ^
“Art. V. It is understood and agreed that the laws and regulations adopted, or that may be adopted, by the United States and by the Republic of Cuba, to protect their revenues and prevent fraud in the declarations and proofs that the articles of merchandise to which this convention may apply are the product or manufacture of the United States and the Republic of Cuba, respectively, shall not impose any additional charge or fees therefor on the articles imported, excepting the consular fees established, or which may be established, by either of the two countries for issuing shipping documents, which fees shall not be higher than those charged on the shipments of similar merchandise from any other nation whatsoever.
$ ‡ ‡ $
“Art. YIII. The rates of duty herein granted by the United States to the Republic of Cuba are and shall con *298 tinue during the term of this convention preferential in respect to all like imports from other countries, and, in return for said preferential rates of duty granted to the Republic of Cuba by the United States, it is agreed that the concession herein granted on the part of the said Republic of Cuba to the products of the United States shall likewise be, and shall continue, during the term of this convention, preferential in respect to all like imports from other countries. * * *
“ART. IX. In order to maintain the mutual advantages granted in the present convention by the United States to the Republic of Cuba and by the Republic of Cuba to the United States, it is understood and agreed that any tax or charge that may be imposed by the national or local authorities of either of the two countries upon the articles of merchandise embraced in the provisions of this convention, subsequent to importation and prior to their entering into consumption in the respective countries, shall be imposed and collected without discrimination upon like articles whencesoever imported.
“Art. X. It is hereby understood and agreed that in case of changes in the tariff of either country which deprive the other of the advantage which is represented by the percentages herein agreed upon, on the actual rates of the tariffs now in force, the country so deprived of this protection reserves the right to terminate its obligations under this convention after six months’ notice to the other of its intention to arrest the operations thereof.
“And it is further understood and agreed that if, at any time during the term of this convention, after the expiration of the first year, the protection herein granted to the products and manufactures of the United States on the basis of the actual rates of the tariff of the Republic of Cuba now in force, should appear to the Government of the said Republic to be excessive in view of a new tariff law that may be adopted by it after this convention becomes operative, then the said Republic of Cuba may reopen negotiations with a view to securing such modifications as may appear proper to both contracting parties.”
On December 17, 1903 (U. S. Code, secs. 124, 125, Title 19), the following act of Congress was approved:
“Sec. 124. Products of Cuba; reduction of duties on.— So long as the convention between the United States and the Republic of Cuba, signed on the 11th day of December, in the year 1902, shall remain in force, all articles of merchandise being the product of the soil or industry of the Repub- *299 lie of Cuba, which on December 17, 1903, were imported into the United States free of duty, shall continue to be so admitted free of duty, and all other articles of merchandise being the product of the soil or industry of the Republic of Cuba imported into the United States shall be admitted at a reduction of 20 per centum of the rates of duty thereon, as provided by this chapter, or as may be provided by any tariff law of the United States subsequently enacted. The rates of duty herein granted by the United States to the Eepublic of Cuba are and shall continue during the term of said convention preferential in respect to all like imports from other countries. Nothing contained in this section shall be held or construed as an admission on the part of the House of Eepresentatives that customs duties can be changed otherwise than by an act of Congress, originating in said House. (Dec. 17, 1903, c. 1, § 1, 33 Stat. 3; Oct. 3, 1913, c. 16, § IV B, 38 Stat. 192.)
“ Sec. 125. Same; no additional charges on-; equal treatment of imports. — So long as the convention mentioned in section 124 of this title shall remain in force, the laws and regulations adopted, or that may be adopted by the United States to protect the revenues and prevent fraud in the declarations and proofs, that the articles of merchandise to which said convention may apply are the product or manufacture of the Eepublic of Cuba, shall not impose any additional charge or fees therefor on the articles imported, excepting the consular fees established, or which may be established, by the United States for issuing shipping documents, which fees shall not be higher than those charged on the shipments of similar merchandise from any other nation whatsoever. Articles of the Eepublic of Cuba shall receive, on their importation into the ports of the United States, treatment equal to that which similar articles of the United States shall receive on their importation into the ports of the Eepublic of Cuba. Any tax or charge that may be imposed by the national or local authorities of the United States upon the articles of merchandise of the Ee-public of Cuba, embraced in the provisions of said convention, subsequent to importation and prior to their entering into consumption into the United States, shall be imposed and collected without discrimination upon like articles whensoever imported.”
Section 10 of the tariff act of July 24,1897 (30 Stat. 206), mentioned in Article II of the foregoing treaty, provided in terms as follows:
“ That section thirty-three hundred and ninety-four of the Revised Statutes of the United States, as amended, be, *300 and the same is hereby, further amended, so as to read as follows:
“ ' Upon cigars which shall be manufactured and sold, or removed for consumption or sale, there shall be assessed and collected the following taxes, to be paid by the manufacturer thereof: On cigars of all descriptions made of tobacco, or any substitute therefor, and weighing more than three pounds per thousand, three dollars per thousand; on cigars, made of tobacco, or any substitute therefor, and weighing not more than three pounds per thousand, one dollar per thousand; on cigarettes, made of tobacco, or any substitute therefor, and weighing more than three pounds per thousand, three dollars per thousand; on cigarettes, made of tobacco, or any substitute therefor, and weighing not more than three pounds per thousand, one dollar per thousand : Provided, That all rolls of tobacco, or any substitute therefor, wrapped with tobacco, shall be classed as cigars, and all rolls of tobacco, or any substitute therefor, wrapped in paper or any substance other than tobacco, shall be classed as cigarettes.
“ ' And the Commissioner of Internal Revenue, with the approval of the Secretary of the Treasury, shall provide dies and adhesive stamps for cigars weighing not more than three pounds per thousand: Provided, That such stamps shall be in denominations of ten, twenty, fifty, and one hundred, and and the laws and regulations governing the packing and removal for sale of cigarettes, and the affixing and cancelling of the stamps on the packages thereof, shall apply to cigars weighing not more than three pounds per thousand.’ ”
Paragraph 217 of the foregoing tariff act (30 Stat. 169) levied the following import duties:
“ 217. Cigars, cigarettes, cheroots of all kinds, four dollars and fifty cents per pound and twenty-five per centum ad valorem; * * *.”
Without quoting the provisions of the tariff acts subsequent to 1897, it is sufficient for present purposes to state the duties upon importations of the character here involved were continued therein and no point arises with respect thereto. It is to be observed, however, that Article II of the treaty between the United States and Cuba provides that Cuban products as therein limited “ shall be admitted at a reduction of twenty per centum of the rates of duty thereon as provided by the tariff act of the United States approved July *301 24, 1897, or as may be provided by any tariff law of the United States subsequently enacted.”
The plaintiff alleges that inasmuch as section 10 of the act of July 24, 1897, supra, is a distinct provision of the tariff act of that date, and levies, in addition to the duties exacted by paragraph 217 of the act, the taxes therein prescribed, that it was entitled to a reduction of twenty per centum of the taxes levied by section 10 of the act, precisely as it was entitled to the same reduction accorded it under paragraph 217 of the act. In other words, that for the sums expended in the procurement of internal-revenue stamps exacted by the collector of customs under sections 3377 and 3402, Revised Statutes, in accord with Treasury and customs regulations with respect thereto, it is entitled to recover back from the full amount paid therefor twenty per centum thereof under Art. II of the treaty as aforesaid.
The first and, obviously important issue arising under the demurrer is one of jurisdiction. If the asserted claim is one “growing out of or dependent on any treaty stipulation entered into with foreign nations ” this court is without jurisdiction. Sec. 153 of the Judicial Code. Sec. 1066, R. S. Eastern Extension, Australasia & China Telegraph Co., Ltd., v. United States, 231 U. S. 326; Kinkead v. United States, 18 C. Cls. 504, 514. The plaintiff’s contention is that the asserted claim is one founded upon the act of December 17, 1903, and hence jurisdiction attaches in virtue of section 145 of the code, our general jurisdictional act. The act of December 17, 1903, supra, is entitled “An act to carry into effect a convention between the United States and the Republic of Cuba, signed on the eleventh day of December, in the year nineteen hundred and two.” The act itself was made necessary by the action of the Senate wherein ratification of the treaty with amendments was advised. Article XI provided: “ This convention shall not take effect until the same shall have been approved by the Congress.” The treaty with the amendments was duly ratified by the two countries involved, and proclaimed on December 17, 1903. United States v. American Sugar Refining Co., 202 U. S. 563. Since that date the instrument was treated and observed as a treaty obligation, and the act of Congress of *302 December 17, 1903, regarded as an essential legislative step, the final one, to fix its effective date. This is in accord with the ruling of the Supreme Court in the American Sugar Refining case just cited. The plaintiff in opposition cites the case of United States v. Weld, 127 U. S. 51. In our opinion, it is decidedly inapposite, and if at all available as a precedent supports rather than discredits the demurrer. The case itself was the outgrowth of an award paid to the United States by Great Britain in settlement of the historical Alabama Claims in accord with an arbitration provided for in the treaty of Washington (17 Stat. 863). The sum awarded the United States—The Geneva Award—was $15,500,000, and following its liquidation the Congress created a tribunal known as the Court of Commissioners of Alabama Claims and conferred upon the same jurisdiction to hear and determine the claims of citizens to any portion of the award. Obviously the act of Congress created a right which under the treaty could not have been asserted in this court. Other cases of a like nature have been before this and the Supreme Court, and the Weld case, supra, followed in their adjudication. The Supreme Court in disposing of the issue involved in the Weld case said: December 17, 1903, regarded as an essential legislative step, the final one, to fix its effective date. This is in accord with the ruling of the Supreme Court in the American Sugar Refining case just cited. The plaintiff in opposition cites the case of United States v. Weld, 127 U. S. 51. In our opinion, it is decidedly inapposite, and if at all available as a precedent supports rather than discredits the demurrer. The case itself was the outgrowth of an award paid to the United States by Great Britain in settlement of the historical Alabama Claims in accord with an arbitration provided for in the treaty of Washington (17 Stat. 863). The sum awarded the United States—The Geneva Award—was $15,500,000, and following its liquidation the Congress created a tribunal known as the Court of Commissioners of Alabama Claims and conferred upon the same jurisdiction to hear and determine the claims of citizens to any portion of the award. Obviously the act of Congress created a right which under the treaty could not have been asserted in this court. Other cases of a like nature have been before this and the Supreme Court, and the Weld case, supra, followed in their adjudication. The Supreme Court in disposing of the issue involved in the Weld case said:
“ It may be said, in opposition to this view of the case, that, had there been no treaty of Washington, there would have been no fund of $15,500,000 to distribute, the act of June 5, 1882, would never have been passed, and, therefore, that the treaty is the basis of all the subsequent legislation, and consequently the basis of this claim; in other words, that, therefore, this claim is ‘ dependent upon and grows out of ’ the treaty of Washington. “ It may be said, in opposition to this view of the case, that, had there been no treaty of Washington, there would have been no fund of $15,500,000 to distribute, the act of June 5, 1882, would never have been passed, and, therefore, that the treaty is the basis of all the subsequent legislation, and consequently the basis of this claim; in other words, that, therefore, this claim is ‘ dependent upon and grows out of ’ the treaty of Washington.
“ We are of opinion, however, that such a dependency upon or growing out of, is too remote to come within the meaning of § 1066, Rev. Stat. In our view of the case, the statute contemplates a direct and proximate connection between the treaty and the claim, in order to bring such claim within the class excluded from the jurisdiction of the Court of Claims by § 1066, Bev. Stat. In order to make the claim one arising out of a treaty within the meaning of § 1066, Rev. Stat., the right itself, which the petition makes to be the foundation of the claim, must have its origin—derive its life and existence—from some treaty stipulation. This ruling is “ We are of opinion, however, that such a dependency upon or growing out of, is too remote to come within the meaning of § 1066, Bev. Stat. In our view of the case, the statute contemplates a direct and proximate connection between the treaty and the claim, in order to bring such claim within the class excluded from the jurisdiction of the Court of Claims by § 1066, Rev. Stat. In order to make the claim one arising out of a treaty within the meaning of § 1066, Rev. Stat., the right itself, which the petition makes to be the foundation of the claim, must have its origin—derive its life and existence—from some treaty stipulation. This ruling is *303 analogous to that of the ancient and universal rule relating to damages in common-law actions; namely, that a wrongdoer shall be held responsible only for the proximate, and not for the remote, consequences of his action.”
Attention is directed by the plaintiff to what is said to be a specific prescription of rates of duty in the act of 1903 applicable to the merchandise imported, and from this an inference is drawn that Congress intended the subject matter of the act “ as one entirely for legislative regulation.” In support of this contention the provision in the act that “ Nothing contained in this section shall be held or construed as an admission on the part of the House of Representatives that customs duties can be changed otherwise than by an act of Congress, originating in said House,” is likewise cited. The language of the act of 1903 conforms to the terms of the treaty, the identical subject matter with which Congress was immediately concerned. It would be difficult, indeed, in view of the history of the transaction, to hold that Congress by the act was legislating reciprocal and preferential rights as between two countries with respect to tariff duties, when precisely the same subject matter was covered by treaty stipulations then before Congress for consideration, and in view of the fact that the treaty itself depended by its own provisions for effectiveness upon the enactment of such an act. True, Congress inserted a provision in the act expressly excluding it as a precedent in the event of a conflict as to the lawful and constitutional right to change customs duties otherwise than in an act originating in the House of Representatives; but this provision in no sense indicates that in the enactment of this act Congress was' legislating independently of the treaty. The title and language of the act itself exclude the possibility of such an intent. On the contrary, the facts conclusively show that Congress was acting in accord with the articles of the treaty, and legislating as therein provided to give it effect, whereas without such legislation it would have been ineffective. The case, we think, is governed by the decision of the Supreme Court in the following cases: Eastern Extension, Australasia & *304 China Telegraph Co. (supra), Kinkead v. United States (supra), and Great Western Insurance Co. v. United States, 112 U. S. 193, and this court is without jurisdiction to consider it.
The demurrer will be sustained and the petition dismissed. It is so ordered.
Whalet, Judge; Williams, Judge; and LittletoN, Judge, concur.