## OLIN J. STEPHENS, Inc., v. AMERICAN REAL ESTATE CO.

### In re WHITEHORN et al.

(District Court, S. D. New York. November 1, 1921.)

1. Equity ⊂⇒410(1)—Master's report, fixing reasonable rents, stands as to all tenants who do not except.

The report of the master, fixing the rentals which the receiver might charge for apartments in the building held by him, stands confirmed as to all tenants who do not except.

2. Landlord and tenant ⊂⇒200(1½)—New York rent laws did not intend to exclude all fee values in fixing reasonable rents.

Laws N. Y. 1920, c. 944, authorizing a landlord to collect only reasonable rent for the property, was manifestly not intended to exclude from the value of the property in fixing the rent all fee values, which depend on the rent obtainable for the property, and which had been steadily increasing for a long period of time.

3. Landlord and tenant ⊂⇒200(1½)—Statute prohibiting unreasonable rent was not retroactive.

Laws N. Y. 1920, c. 944, invalidating agreements for unreasonable rent, which superseded a similar statute taking effect April 1, 1920 (Laws N. Y. 1920, c. 136), was not retroactive, though section 1 thereof speaks unconditionally, since the canon of statutory construction is against retroactive interpretation.

4. Landlord and tenant ⊂⇒200(1½)—Rent laws apply to agreements made after the first laws were adopted.

Laws N. Y. 1920, c. 944, invalidating agreements for unreasonable rents, which took effect September 27, 1920, but which superseded a similar law taking effect April 1, 1920 (Laws N. Y. 1920, c. 136), invalidates all agreements for unreasonable rent made after April 1.

---

⊂⇒For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes.

**5. Landlord and tenant ⊚⇒200(1½)—Values created by rent existing on April 1, 1920, are to be considered in fixing reasonable rent.**

In determining what is a reasonable rent to which a landlord is en-titled under Laws N. Y. 1920, c. 944, the fee value of the property, as based upon the rents charged on April 1, 1920, the date when the original rent law (Laws N. Y. 1920, c. 136) took effect, is to be taken, rather than the value prior to the period of one year before the act took effect, mentioned in the act, or the value after the legislation took effect and as affected thereby, since to adopt either of the latter dates for determining the value would be to penalize landlords who had not theretofore taken advantage of their tenants by increasing the rents.

**6. Landlord and tenant ⊚⇒200(1½)—Evidence held to show value of leased prem-ises was $300,000.**

Evidence before the master in proceedings to fix the reasonable rental which a receiver might charge for apartments in the property in his posses-sion *held* to show the value of the property, for the purpose of fixing the rents, to be $300,000.

**7. Landlord and tenant ⊚⇒200(1½)—Value for rent fixing is not limited to equity above mortgage.**

In determining the reasonable rent a landlord is entitled to charge, the total value of the property should be considered, and not the value of the landlord's equity above the mortgage on the premises.

**8. Landlord and tenant ⊚⇒200(1½)—Rent permitting 8 per cent. return on valua-tion held "reasonable rents."**

Within the New York rent laws (Laws 1920, c. 136, as amended by Laws 1920, c. 944), reasonable rents are those which bring in a return similar to what was common when the laws took effect, in the absence of evidence as to usual rates of return on real estate of the character in question, which rate in 1921 was at least as high as 8 per cent.

**9. Evidence ⊚⇒18—Court can notice general rates of interest on undoubted se-curities, but not rates on rented property.**

The court cannot take judicial notice of what would be a return on an investment in rented apartment property, but it can take notice of the general rates of interest on undoubted securities.

**10. Landlord and tenant ⊚⇒200(1½)—Excepting tenants not entitled to credit for excess rent paid by other tenants.**

Where some of the tenants in an apartment house did not except to the master's report fixing the reasonable rental of the apartments at too high a figure, the tenants who did except are not entitled to have their rentals reduced, so that the total income of the landlord, including the excess col-lected from the nonexcepting tenants, shall produce only the reasonable re-turn permitted, since they are required to pay a reasonable rental for apartments occupied by them, based on the proportion the value of such apartments bears to the entire value of the property, regardless of what rent other tenants may be willing to pay.

Suit by Olin J. Stephens, Inc., against the American Real Estate Company. On exceptions by David Whitehorn and others, as tenants, to the report of a master fixing the reasonable rental which the receiver might charge for the premises. Exceptions sustained in part.

Sur exceptions to a special master's report under the following circum-stances: The proceeding arises in a "sequestration" or "conservation" suit to protect the interests of creditors. Among the assets was an apartment house occupied by numerous tenants, some of whose rents the receivers raised on October 1, 1920. On September 27, 1920, the New York Legislature passed a series of laws which have been frequently before the courts, and which were designed to protect tenants against the imposition of more than "reasonable rents." The details of this legislation it is not necessary to set forth except to say that under chapter 944 of the Laws of 1920 it was provided that it

should be a defense to an action for rent that the rent demanded was "unjust and unreasonable." Provision was made, when such a defense was pleaded, that the lessor should file a bill of particulars specifying the details of his expenses, receipts, and the like, upon which the court should allow him "a fair and reasonable" rent in such amount as he might prove (section 4). Any increase above the rent due a year before "the time of the agreement" sought to be enforced was presumed to be unreasonable (section 3).

The receivers asked leave summarily to evict the tenants for holding over after the expiration of their terms. This the court denied under chapter 942 of the Laws of 1920, which was thought applicable to federal receivers as well as to any other lessors, and which forbade eviction for failure to pay rent. The petition was, however, treated as analogous to an action for rent under chapter 944, and the cases were all referred to a master to take the proof. He found that the gross rents demanded, on the building as a whole were $57,244, the expenses of upkeep $15,944.96, the taxes $8,066.13, the depreciation (2 per cent. on the value of the building, $170,000) $3,400, a total of $27,411.09. He found the value of the property, fee and building, for the year ending September 30, 1921, as $320,000, on which he allowed a profit of 10 per cent., or $32,000. As a consequence he found that a reasonable rent was $59,411.09, somewhat more than the rents demanded. For these reasons he reported that the rents demanded were reasonable.

The chief points argued at the bar were that the value of the property was taken by a wrong method and at a wrong figure, and should have been only $265,000, the assessed valuation for 1920, and that an adequate rate of profit was 7 per cent. Thus the amount to be added to expenses would be $18,550, and the "reasonable" rent $45,961.09, between 80 per cent. and 81 per cent. of the amount actually demanded. The master was personally disposed to allow only 7 per cent. upon the investment, but felt bound by the supposed authority of the case of Hirsch v. Weiner (App. Term, Second Dept.) 116 Misc. Rep. 312, 190 N. Y. Supp. 111.

Samuel Untermyer and Leo Fassler, both of New York City, for exceptants.

Cornelius Wickersham, of New York City, opposed.

LEARNED HAND, District Judge (after stating the facts as above). [1] Only those tenants who have excepted to the master's report can be heard; as to the other tenants, it stands confirmed on the facts. The exceptants challenge none of the items of disbursements, including the allowance of 2 per cent upon the value of the building for depreciation. The case therefore comes down in substance to two items only—the valuation of the investment and the rate of profit.

The evidence of value consisted of an assessment for the year 1920 of $265,000, made on October 1, 1919, an assessment for the year 1921 of $300,000, made on October 1, 1920, an expert's valuation of $350,000 as of October, 1920, a private valuation by experts for the defendant company as of December, 1915, of $340,000 and an actual sale of the property in April of this year of $320,000, $155,000 on mortgage and the rest cash. The master has found that the value for the period from October, 1920, to October, 1921, was $320,000, and there can in my judgment be no fair challenge of this conclusion. The point, therefore, turns upon the proper time at which value is to be taken. The tenants argue, borrowing in this respect from the reasoning in Hall Realty Co. v. Moos (App. Term, First Dept.) 115 Misc. Rep. 506, 188 N. Y. Supp. 858, 860, that, as the legislation was intended to prevent "unreasonable" rents, no values can be accepted as the basis for fixing rents which are themselves based upon existing "unreasonable" rents.

[2] The problem arises from the nature of "fee" values as distinct from values contributed by buildings and other improvements. All fee values in New York, at the time when this legislation went into effect, were the result of the scarcity of land and the competition of lessees or purchasers to eliminate each other. They had been of gradual growth for many years, were as well recognized a form of property as any other, and it cannot be supposed that the law meant to confiscate them altogether, even for a period of two years. Its aim was only to forbid their extreme exploitation during the existing emergency. It follows that the fee value up to a given time of other similar tenements was a legitimate basis for fixing "reasonable" rents, even though that value rested in essence upon precisely that kind of economic power whose further exercise the law meant to curtail. In short, there must be a period up to which it is proper in estimating investment value to take into consideration the capitalization of rents under free competition. The question is when that period ends.

[3] I think it clear that the legislation was not intended to operate retroactively, by which I mean that the rents reserved upon leases in existence before April 1, 1920, were not thereafter affected by the legislation. Although the language of section 1 of chapter 944 does indeed speak unconditionally, the general canon of statutory construction is strictly against retroactive interpretation. United States v. Am. Sugar Co., 202 U. S. 563, 579, 26 Sup. Ct. 717, 50 L. Ed. 1149. In corroboration of this conclusion it is worth noting that, if section 3 be retroactive, rents may be presumptively unreasonable which have been raised at all beyond those in existence three or more years before. The language of the section reads:

"One year prior to the time of the agreement under which the rent is sought to be recovered."

[4] Surely it cannot have been intended that a lease made, for example, on May 1, 1918, is to be deemed presumptively invalid after April 1, 1920, because the rents reserved are higher than they were on May 1, 1917. The learned counsel for the legislative committee does not assert that existing rents are to be disturbed. Indeed, he is very insistent that the law affects only increases after October 1, 1920. I agree with him, except that it seems to me that the period should date from the first enactment (Laws N. Y. 1920, c. 136); i. e., April 1, 1920.

[5] The question, therefore, is whether, in estimating new rents, those values which had been created by competition on April 1, 1920, may be taken as evidence, or whether an earlier period must be fixed. If so, the only possible period indicated is the year mentioned in section 3. There is something to be said for that result, though it is to be remembered that the section, in form anyway, is only procedural. But the difficulty appears to me to be, if the law be taken as fixing April 1, 1919, as the standard of rents, and so of values, that the result would effect a discrimination which cannot have been intended, and which indeed might put in question its very validity. Because such lessors would be protected who may have exacted the utmost that competition would permit up to April 1, 1920, while those who through moderation or humanity have failed ruthlessly to rack their tenants before that

date must be content to get a profit based upon valuations a year earlier. Thus the law would favor those who had been assiduous in those very practices which it was its purpose to frustrate. I can therefore really see no escape from holding, either that the law operates to reopen all leases existing or prospective as of April 1, 1919, or that it was only meant to prevent any exploitation of tenants beyond the point which competition had established before the time when it went into effect.

It has been argued that values might be taken just after April 1, 1920, when the legislation itself had presumably affected values and rents; but that does not meet the discrimination I have mentioned. Earlier leases would still remain intact, and preference would still be given to extortionate lessors. It is by no means unlikely that this interpretation accomplishes all that was intended, though the legislation is indeed not marked by scrupulous exactitude of definition. Its purpose was primarily to prevent wholesale evictions, with their resulting misery and disorders. That could, of course, have been most completely accomplished by preventing any future rise in rents whatever, but that was either thought to be unconstitutional or unfair. If those lessors who did raise their rents were checked by a standard determined by those already in existence, the purpose was in part anyway accomplished. I can only say that, if more was intended, more should have been expressed. Section 3 I read as merely putting to his proof any lessor who had raised his rent within a year.

[6] Now, it is impossible on this record to find with much certainty the value of these premises on April 1, 1920. Judged by the assessment values, it was $282,500, assuming the increase within the year to be prorated. Yet, considering the probable effect of this legislation, it is scarcely reasonable to assume that the increase should be apportioned equally before and after April 1. Moreover, I cannot take the assessed values as certain evidence of actual values. The property sold for $20,000 more than its assessed value on October 1, 1920, within seven months thereafter, and that, too, while these laws were in force. If I take the value at $300,000, it will be as fair an estimate as I can make. I cannot wholly ignore the expert testimony, which was competent, though perhaps partisan.

[7] Clearly the value of the equity in the property is not the test. The lessor owns the fee, his mortgage is merely a lien, and the mortgagee holds nothing but security for a debt, which can be discharged by payment from any funds. If any such rule were to be applied, all the personal property of the mortgagee would have to be marshaled against the mortgage first, an obviously absurd rule. A mortgage is no more than a preference in re over the debtor's other creditors. The absurd results of a contrary rule are alone enough to show its fallacy. The tenants are enjoying the use of the same land, whether it is mortgaged or not, and, if ownership were to be divided on any such theory, the mortgagee must be treated as part owner, and entitled to recover his proportion of a reasonable rent, which he would, I suppose, hold in trust for the mortgagor.

[8, 9] The next point is of the proper rate to be allowed. The record contains no evidence of the usual rates of return upon real estate

of this character, and nothing, therefore, on which a finding can be based. "Reasonable" rents, I take it, mean those which bring in a return similar to what was common at the time when the laws took effect. The tenants admit that lessors are entitled to 7 per cent., and that in the master's judgment was enough. I have nothing to go on, except such facts as I can take judicial notice of, and these do not include a knowledge of what should be the return upon this class of investment. Nevertheless I think I may take notice of the general rates of interest upon undoubted securities, and, as was said in Hirsch v. Weiner, supra, this, at least at the period in question, was as high as 8 per cent.

It is not likely that the return upon tenements of this character was less than that upon such securities, and in the absence of proof it is fair to accept that figure. Higher profit, if it was peculiar to this class of investment, is certainly matter of proof, and here there is no proof. Nor can I feel bound by the dicta in Hirsch v. Weiner, supra. If the declaration of 10 per cent. in that case as a proper rate was not based upon evidence, with great deference I cannot feel it authoritative upon me. If it was, it depended upon the proof there offered. I therefore allow a return of 8 per cent. on $300,000, or $24,000. It results that I find "reasonable" rents to have been $51,411.09, which is almost exactly 90 per cent. of $57,244, the rents demanded. I therefore allow the receivers against the exceptants 90 per cent. of the rents charged them, instead of 80 per cent., as they concede.

[10] It is necessary only to allude to the remaining point; i. e., that the rents actually received elsewhere in the building should be taken in exoneration of these exceptants. This is incorrect; the lessor is entitled in each case to that portion of the total reasonable rent of the whole building which the value of the tenant's accommodation bears to that of the aggregate tenements. It is irrelevant that the lessor may in some instances have succeeded in getting more than he could have compelled others to pay. There is nothing illegal in his making such bargains as such others voluntarily agree to, and it must be assumed, in view of the relief which these statutes afford, that all rents which are not contested are voluntarily paid.

The affidavit offered at the hearing is rejected. The receivers will bear the costs of the reference as provided heretofore.