**CITY OF CLEVELAND, OHIO,**
Petitioner,

v.

**FEDERAL POWER COMMISSION,**
Respondent,

Cleveland Electric Illuminating
Company, Intervenor.

No. 73–1282.

United States Court of Appeals,
District of Columbia Circuit.

Argued Nov. 6, 1974.

Decided Jan. 9, 1976.

Reuben Goldberg, Washington, D. C., with whom David Hjelmfelt, Washington, D. C., was on the brief, for petitioner.

Scott M. DuBoff, Atty., F. P. C., of the pro hac vice, Washington, D. C., for respondent. Leo E. Forquer, Gen. Counsel, F. P. C., and George W. McHenry, Sol., F. P. C., Washington, D. C., were on the brief, for respondent. John H. Burnes, Jr., Atty., F. P. C., Washington, D. C., also entered an appearance for respondent.

Harry A. Poth, Jr., Washington, D. C., with whom Robert T. Hall, III, Washington, D. C., was on the brief, for intervenor.

Before FAHY, Senior Circuit Judge, and ROBINSON and WILKEY, Circuit Judges.

SPOTTSWOOD W. ROBINSON, III, Circuit Judge:

This petition for review poses centrally the question whether the Federal Power Commission erred in adopting a rate structure specified in a schedule filed by a public electric utility without resolving its municipal customer's contention that the schedule contravenes a preexisting agreement between the parties. We answer that question in the affirmative. Accordingly, while we affirm the Commission on all other issues presented, we remand the case for further proceedings.

I

The City of Cleveland, Ohio, operates an electric light plant from which a part of the electrical power it consumes is derived. Its remaining requirements are served by the Cleveland Electric Illuminating Company (CEI), a public utility as defined by the Federal Power Act.[1] During the 1969 Christmas season, the municipal plant suffered a forced outage of its largest generating unit, which rendered it unable to supply normal street lighting and customer service. The train of activity designed to meet this crisis led ultimately to the litigation now before us.

Negotiations between the City and CEI produced an early understanding on

---

1. Act of June 10, 1920, ch. 285, 41 Stat. 1063, as added by Act of Aug. 26, 1935, ch. 687, pt. II, § 213(e), 49 Stat. 848, 16 U.S.C. § 824(e) (1970).

a temporary load transfer service [2] to alleviate the emergency.[3] To satisfy a requirement of the City's charter,[4] its City Council, on January 19, 1970, passed Ordinance No. 161–70 [5] authorizing a contract with CEI for the service at rates previously worked out.[6] On the following day, representatives of the parties signed a letter agreement [7] calling for the service for a maximum term expiring on December 31, 1971.[8] The letter agreement and subsequent modifications [9] were later submitted to [10] and accepted by the Commission for filing as a rate schedule.[11]

2. As explained by the City, this type of service "involves disconnecting a segment of [the municipal] distribution system and connecting it to the CEI system. This permits CEI to supply electricity for a portion of [the municipal plant's] load without requiring [the municipal system] and CEI to operate synchronously." Brief for Petitioner at 2 n. 2.

3. Prior proposals, extending back to 1942, for a permanent interconnection between the CEI and municipal systems had not materialized largely because the City wished to maintain a degree of self-sufficiency. It appears that about mid-1969, however, the City and CEI began consideration of a plan whereby CEI would take over a portion of the municipal plant's load, and that by the latter part of September engineering studies had progressed to the point that the amount and methodology of load transfer as well as approximate costs had been agreed upon, and a target date of March, 1970, had been set for completion. These arrangements were adaptable to the emergency which the City faced as 1969 drew to a close.

4. The City represents that "[a]s a political subdivision of the State of Ohio, Cleveland could enter into a contract for the service at the agreed-upon rates only by complying with the requirements of its City Charter, which requires that all contracts involving an expenditure in excess of $500 must first be authorized and directed by Ordinance of the City Council and which further provides that all contracts that do not comply with these requirements 'shall be void' "; and that "[s]ince the contract with CEI would involve an expenditure in excess of $500, an Ordinance was required to authorize the contract for load transfer service at the agreed-upon rates." Brief for Petitioner at 7–8. The record before us sets forth but two sections of the charter, and they do not themselves seem to attest the City's statement in all respects. They do, however, indicate that there are other sections which bear on the matter. Neither the Commission nor CEI disputes the City's representation, and like the parties we accept it for purposes of the present review.

5. Ordinance No. 161–70 repealed a substantially similar ordinance, No. 115–70, passed January 14, 1970. The principal purpose of Ordinance No. 161–70 was to provide for reimbursement to CEI for the cost of interconnection.

6. The ordinance specified that the contract "shall provide . . . that the CEI shall sell said power to the City at a rate not to exceed 30¢ a month per KVA demand, $0.0085 per KWH for 10 million KWH and $0.005 per KWH above 10 million." J.App. 65.

CEI's brief informs us that

KVA (kilovolt amperes) is a measure of the total power supplied and indicates the minimum capacity of the equipment required to provide service. For the purpose of simplifying billing the monthly demand is determined in terms of kilowatt amperes, instead of kilowatts, thereby including both the physical demand on CEI and the power factor in one component of the rate. The maximum kilowatt (kw) demand and power factor (representing the average relationship between kw and kva) are determined monthly and converted to kva for use in billing, . . .

Brief for Intervenor at 5 n. 3.

7. As to rates, the agreement provided:

Contract Demand Charge—
For each KVA of Contract Demand per month per KVA ...... $0.30

Energy Charge—
For the first 400 KWH per KVA of Contract Demand per KWH .. $0.0085

For all additional KWH ........ $0.005

J.App. 73.

8. The service was to terminate sooner if and when two gas turbines purchased by the City became operable to provide ready reserve and insure reliability of the system.

9. None of the modifications has any material bearing on this litigation.

10. CEI did not submit the authorizing ordinance as a part of its schedule-filing; instead, it listed the ordinance as one of the documents accompanying the filing.

11. The Commission's letter of July 17, 1970, accepting the letter agreement and the first modification, provided:

CEI commenced service in February, 1970, and the City made payments therefor through March, 1971. At this point, the City challenged CEI's billings on the ground that the rates which it had filed with the Commission exceeded those which the parties had agreed to and which Ordinance No. 161–70 had authorized. This dispute, together with another over amounts allegedly owed by the City,[12] disrupted efforts to arrange a permanent interconnection, and precipitated a suit by CEI for arrearages,[13] a complaint by the City launching the proceeding under review,[14] and a notice by CEI that it was cancelling the service.[15]

In its complaint to the Commission, filed May 13, 1971, the City sought a permanent interconnection with CEI,[16] a ruling on the rate and arrearages issues, and an order forbidding termination of the temporary service.[17] CEI extended its cancellation notice to December 16,

1971, at which time the Commission suspended the notice until May 17, 1972,[18] and on May 18 continued the service and the filed rates in effect pending further order.[19] On May 30, the Commission fixed interim rates for continuation of the service until entry of its final order in the proceedings.[20]

During March and April, 1972, hearings were conducted by an examiner [21] who, on July 12, issued an initial decision [22] finding that a permanent synchronous interconnection would serve the public interest.[23] He directed the interconnection on specified terms and conditions, including authority to levy a charge for late payment of bills,[24] and proceeded to set rates for the permanent service.[25] The examiner found wanting the City's argument that the rates filed by CEI, and exacted until the Commission-fixed rates went into operation,[26]

This acceptance for filing does not constitute approval of any service, rate, charge, classification, or any rule, regulation, contract, or practice affecting such rate or service provided for in the above-designated rate schedule and rate schedule supplement; nor shall such acceptance be deemed as recognition of any claimed contractual right or obligation affecting or relating to such service or rate; and such acceptance is without prejudice to any findings or orders which have been or may hereafter be made by the Commission in any proceeding now pending or hereafter instituted by or against your company.

J.App. at 89–90. The Commission's letter of November 13, 1970, accepting two additional modifications, uses almost identical language, and the slight variation is unimportant to the issues presented on this review.

12. See note 13 *infra.*

13. The suit, filed in the Court of Common Pleas of Cuyahoga County, Ohio, claimed $1,352,286.60 in unpaid bills.

14. *City of Cleveland v. Cleveland Elec. Illuminating Co.,* Docket No. E–7631 (F.P.C.).

15. *Cleveland Elec. Illuminating Co.,* Docket No. E–7633 (F.P.C.).

16. See Federal Power Act § 202(b), 16 U.S.C. § 824a(b) (1970).

17. See Federal Power Act § 202(c), 16 U.S.C. § 824a(c) (1970).

18. *City of Cleveland v. Cleveland Elec. Illuminating Co.,* 46 F.P.C. 1326 (1971). In the same order, the Commission consolidated the City's complaint (Docket No. E–7631 and CEI's cancellation proceeding Docket No. E–7633), set both matters for hearing and denied the City's request for an immediate emergency interconnection. But see note 19 *infra.*

19. *City of Cleveland v. Cleveland Elec. Illuminating Co.,* 47 F.P.C. 1317 (1972). After rejecting the City's bid for an emergency interconnection, see note 18 *supra,* the Commission, on January 31, 1972, also turned down its request for a permanent interconnection. *City of Cleveland v. Cleveland Elec. Illuminating Co.,* 47 F.P.C. 198 (1972). On March 8, however, after the municipal plant experienced the latest of three outages over a five-month period, the Commission directed a temporary emergency interconnection. *City of Cleveland v. Cleveland Elec. Illuminating Co.,* 47 F.P.C. 747 (1972).

20. *City of Cleveland v. Cleveland Elec. Illuminating Co.,* 47 F.P.C. 1412 (1972).

21. Now administrative law judge.

22. *City of Cleveland v. Cleveland Elec. Illuminating Co.,* 49 F.P.C. 126 (1972) (examiner's initial decision).

23. *Id.* at 128–129.

24. *Id.* at 129.

25. *Id.* at 128–129.

26. See text *supra* at notes 19–20.

did not abide the actual agreement of the parties.[27]

Both the City and CEI filed exceptions, upon consideration of which the Commission, in Opinion No. 644, adopted the examiner's decision in all but several relatively minor respects.[28] Adjustments were made in the rates,[29] which were to include the effects of an Ohio excise tax,[30] an item which the examiner had excluded.[31] The Commission retained and refined the examiner's late-charge feature,[32] and left standing his rejection of the City's objection to the filed rates.[33] By Opinion No. 644–A, the City's application for rehearing was denied,[34] whereupon its petition for review by this court followed.

 The petition presents for our decision contentions that the Commission erred (a) in adhering to the rates filed by CEI despite the claims that they did not accurately reflect those previously agreed to; [35] (b) in prescribing permanent rates allegedly lacking substantial supporting evidence; [36] (c) in including the

27. *City of Cleveland v. Cleveland Elec. Illuminating Co., supra* note 22, 49 F.P.C. at 131–132 (examiner's initial decision).

28. *City of Cleveland v. Cleveland Elec. Illuminating Co.* (Opinion No. 644), 49 F.P.C. 118 (1973).

29. *Id.* at 121–123.

30. *Id.* at 122–123.

31. *City of Cleveland v. Cleveland Elec. Illuminating Co., supra* note 22, 49 F.P.C. at 133 (examiner's initial decision).

32. *City of Cleveland v. Cleveland Elec. Illuminating Co.* (Opinion No. 644), *supra* note 28, 49 F.P.C. at 123–124.

33. *Id.* at 120.

34. *City of Cleveland v. Cleveland Elec. Illuminating Co.* (Opinion No. 644–A), 49 F.P.C. 631 (1973).

35. Discussed in Part II *infra*.

36. The rate set by the Commission for permanent load transfer service after May 17, 1972, see text *supra* at note 20, was 15.2 mills per KWH, which included 0.7 mills for the Ohio excise tax and another 1.2 mills for administrative and overhead costs. *City of Cleveland v. Cleveland Elec. Illuminating Co.* (Opinion No. 644), *supra* note 28, 49 F.P.C. at 123. Both of these items are contested by the City, and we discuss the tax factor in note 37 *infra*. The objection to the administrative-overhead factor is actually an attack on a cost-of-service presentation by CEI, from which that factor was derived; deeming the study discredited during the hearings, the City says that that factor lacks evidentiary support.

The 1.2-mill administrative-overhead cost component was 10% of CEI's energy-related expense of maintaining the permanent interconnection. In accepting the 1.2-mill figure, the Commission pointed out that "[t]he record demonstrates that this is the usual allowance in interconnection rates" and that "[t]he parties do not question that this is a commonly used rule-of-thumb estimate in the industry. . . ." *Id.* at 123.

The City argues, however, that CEI was entitled to recover only its own costs, and that it was error to use the industry rule-of-thumb estimate as a basis for projecting them. That position overlooks the propriety of considering an industry wide-average in the formulation of an opinion as to an item of the expense of furnishing a relatively new and untried service, and the desirability of doing so as a test of the reasonableness of the estimate. The cost data employed in the computation were CEI's own; only the percentage of those costs properly allocable to administration and overhead associated with the interconnection was affected by reference to industry-wide experience. The Commission was unable to "find any evidence that the industry figure of 10 percent chosen by CEI is unreasonable," *id.*, and that is also our view of the record before us. We have no cause to upset the Commission on this point.

Nor do we believe that we can override the Commission on other aspects of the sufficiency-of-the evidence argument tendered by the City. While there was some testimonial criticism of CEI's cost study, there was also support for the 1.2-mill result it reached, and no useful purpose could be served by detailing the opposing evidentiary presentations. For in the end it was for the Commission, not us, to evaluate the respective justifications put forth on the record, and to choose between two divergent theories in setting the amount of the challenged factor. A conclusion on "conflicting engineering and economic issues is precisely that which the Commission exists to determine, so long as it cannot be said . . . that the judgment which it exercised had no basis in evidence and so was devoid of reason." *United States ex rel. Chapman v. FPC*, 345 U.S. 153, 171, 73 S.Ct. 609, 619, 97 L.Ed. 918, 932–933 (1953). See also *Gainesville Utils. Dept. v. Florida Power Corp.*, 402 U.S. 515, 527–528, 91 S.Ct. 1592, 1599, 29 L.Ed.2d 74, 83–84 (1971); *Permian Basin Area Rate Cases (Continental Oil Co. v. FPC)*, 390 U.S.

amount of the Ohio excise tax in the makeup of the permanent rates;[37] and

747, 767, 88 S.Ct. 1344, 1360, 20 L.Ed.2d 312, 336 (1968). In this instance, we cannot say nearly so much.

**37.** In calculating the permanent rate, note 20 *supra*, the Commission made an allowance for Ohio taxes being levied against CEI's gross receipts from the load transfer service. The applicability of the tax to that operation was at the time the subject of litigation in state tribunals, and on that account the City insists that the tax was outlawed for ratemaking purposes. We do not agree. Taxes, like other necessary operating expenses, may properly be included as rate components, *e. g., Georgia Ry. & Power Co. v. Railroad Comm'n*, 262 U.S. 625, 633, 43 S.Ct. 680, 682, 67 L.Ed. 1144, 1148 (1923); *Galveston Elec. Co. v. City of Galveston*, 258 U.S. 388, 399, 42 S.Ct. 351, 356, 66 L.Ed. 678, 684–685 (1922); *City of Chicago v. FPC*, 147 U.S.App.D.C. 312, 336, 458 F.2d 731, 756 (1971), *cert. denied*, 405 U.S. 1074, 92 S.Ct. 1495, 31 L.Ed.2d 808 (1972); CEI was paying and had to continue payment of the tax until such time as the proper authorities in Ohio might rule to the contrary.

Moreover, the City is amply protected against the possibility that assessment of the tax in the situation at bar was legally mistaken. The Commission specified that in the event that the tax is held to be inapplicable, "CEI shall within 30 days from the date of such determination file rates to eliminate such tax and flow-through to City its proportionate share of any refunds, including interest thereon, received by CEI as a result of such determination." *City of Cleveland v. Cleveland Elec. Illuminating Co.* (Opinion No. 644), *supra* note 28, 49 F.P.C. at 125. And even if erroneously collected gross receipts taxes are nonrecoverable under Ohio law—a point on which the parties are in dispute—the City is sheltered from loss. While the Commission's order may be limited to refunds actually received by the taxpayer, CEI represents that it "has stated publicly before, and repeats herein, that it will refund any amounts attributable to the Ohio tax on bills rendered after May 17, 1972, if it is found that the Company is not legally required to pay this tax on these particular sales, regardless of *whether the Company receives a refund from the State for those amounts or not.*" Brief for Intervenor at 28 (emphasis in original). Thus the City has full recourse to CEI for reimbursement should the tax be declared inoperable.

**38.** The Commission directed a 5% increase in bills unpaid for 45 days, and an additional 1% after 60 days until paid. *City of Cleveland v. Cleveland Elec. Illuminating Co.* (Opinion No. 644), *supra* note 28, 49 F.P.C. at 123. Al-

(d) in sanctioning the charge for late payment.[38] We agree with the City on

though the City had previously agreed to a late charge of 5% after 45 days and a flat 2½% after 60 days, *City of Cleveland v. Cleveland Elec. Illuminating Co., supra* note 22, 49 F.P.C. at 129 (examiner's initial decision), it now urges that the Commission's version of the charge lacks substantial supporting evidence.

The Commission noted that the "City has for some time refused to pay, or has been quite late in paying, certain bills rendered by CEI," and the Commission was sensitive to the consideration that in ordering interconnection it "may not, lawfully, impose an undue burden upon CEI." *City of Cleveland v. Cleveland Elec. Illuminating Co.* (Opinion No. 644), *supra* note 28, 49 F.P.C. at 123. The Commission explained that "[t]he imposition of an additional 5 per cent after 45 days should act as an inducement for prompt payment by City," a view in which the City concurred, *id.*, and the Commission also felt that

> [t]he imposition of an additional 1 percent per month appears for the following reason. An allowance for the cost of working capital as a part of rate base is properly included in a cost of service. The total impact of rate of return plus related state and Federal income taxes will average about 12 percent annually. The 1 percent per month addition to bills rendered by CEI to City but not paid within 60 days is not intended to be in the nature of a penalty, but rather, in effect, tracks the increased cost to CEI of providing additional working capital in recognition of the added time lag between the incurrence of costs by CEI and the receipt of revenues from City.

*Id.* at 124.

We find no error in the Commission's prescription. In view of the City's history of delayed payment, the Commission was fully justified in requiring a late charge, and in relating the charge to the increased costs that late payment engenders the Commission stood on solid ground. "[T]he need for working capital arises largely from the time lag between payment by the Company of its expenses and receipt by the Company of payments for service in respect of which the expenses were incurred," *Alabama-Tennessee Natural Gas Co. v. FPC*, 203 F.2d 494, 498 (3d Cir. 1953), and we have no doubt whatever that the Commission may properly take that phenomenon into account. There is, too, ample support for the payment formula which the Commission prescribed notwithstanding the City's point that the record does not disclose CEI's cost of acquiring new capital. It is well settled that courts will take judicial notice of current rates of interest on normal borrowing, see *e. g.,*

the first point,[39] and with the Commission on the others.[40]

## II

The City's primary argument is that CEI's filings with the Commission, which eventuated as the schedule governing the rates payable until the Commission fixed rates of its own,[41] departed from the preexisting agreement of the parties. As we approach our examination of that position we pause at the outset to more precisely define the problem. Save for different expressions of the formula for computation of CEI's charges for the load transfer service, the rates respectively specified in the parties' letter agreement,[42] in Ordinance No. 161–70 [43] and in the filed schedule [44] are virtually the same.[45] The controversy arises from a variance, between the letter agreement and the rate schedule on the one hand and the ordinance and the antecedent agreement on the other, concerning an aspect of the City's liability beyond payment for the load transfer service at the stated rates. The letter agreement, and by virtue of its filing [46] the schedule in turn, contained what is known as a "rachet clause;" in stark contrast, no comparable element of the overall rate structure was mentioned in the ordinance or, at least from the City's viewpoint, during the prior negotiations between the parties. Consequently, the City contends that this feature was not a part of their bargain, and that its representative lacked authority to enter into an agreement containing such a provision.

The rachet clause provides in substance that when the amount of electrical energy actually supplied by CEI exceeds the amount called for by the letter agreement, the contract demand will thereupon increase by the amount of the excess.[47] The practical effect of this provision is that each time consumption of energy above that specified in the agreement rises to a new level, the demand charge is elevated to that new level and is never reduced, even if actual demand thereafter declines substantially. The impact of the clause thus is upon the ultimate dollar amount owed by the City rather than upon the rate determining the charge for the energy used. Considering the potential of this clause for major, automatic increases in the price of electricity to the City and its customers, the importance of the issue over it can hardly be downplayed.

The examiner upheld the applicability of the rachet clause in reliance on the so-called "filed rate doctrine"—the principle that a public utility may charge

---

*Simpson v. United States*, 252 U.S. 547, 550, 40 S.Ct. 367, 368, 64 L.Ed. 709, 712 (1920); *In re St. Louis–San Francisco Ry.*, 68 F.Supp. 921, 922 (E.D.Mo.1946); *Olin J. Stephens, Inc. v. American Real Estate Co.*, 279 F. 435, 440 (S.D.N.Y.1921); *City of Danville v. Chesapeake & O. Ry.*, 34 F.Supp. 620, 638–639 (W.D.Va.1940), and we perceive no reason why an expert body like the Commission cannot do so for purposes of approximating the capital-acquisition costs of an industry it daily regulates.

**39.** See Part II, *infra.*

**40.** See notes 36–38 *supra.*

**41.** See notes 9–11 *supra* and accompanying text.

**42.** See notes 7–8 *supra* and accompanying text.

**43.** See notes 5–6 *supra* and accompanying text.

**44.** The rates in the schedule were, of course, those in the letter agreement. See notes 9–11 *supra* and accompanying text.

**45.** All seem agreed that superficial language differences in this regard between the letter agreement and the ordinance are not genuine discrepancies, but only the products of different styles of authorship.

**46.** See notes 9–11 *supra* and accompanying text.

**47.** The rachet clause reads as follows:

The Contract Demand shall be increased or decreased as appropriate when points of connection are added or removed. If the load supplied at any point of connection exceeds the amount specified and agreed upon, the Contract Demand shall be increased thereupon by the amount of such excess. The Contract Demand shall not be changed other than through the operation of the two preceding sentences.

J.App. 73.

only the rate on file with the Commission unless changed in a manner sanctioned by the governing regulatory statute.[48] He said:

> City Ordinance 161–70, passed January 19, 1970, did not establish a contract between CEI and the City. It was a unilateral action by the City Council authorizing MELP [Municipal Electric Light Plant] to enter into an agreement with CEI for the load transfer service. The agreement of January 20, 1970, between CEI and MELP defines the contract between the parties and the terms of the load transfer service (Ex. 51–54). Rate Schedule No. 7, embodying that contract, was filed with the Commission by CEI, as Rate Schedule FPC No. 7. Under Section 205(c) and (d) of the Act, and the regulations issued pursuant thereto, the only legal rates are those rates which are on file with the Commission. The so-called Ordinance rate was never agreed to by the parties or filed with the Commission. The agreement of January 20, 1970, was signed by the appropriate City officials, the Director of MELP and the Director of Law, and filed with the Commission. (Ex. 51–54) Any alleged violation of the Ordinance is a local matter between the City and its officials. The Ordinance cannot modify the provisions of the Federal Power Act or the regulations duly issued thereunder. As noted by the Court in *Northwestern Public Service Co. v. Montana-Dakota Utils. Co.,* . . .[49]

> "So long as the filed rate is not changed in the manner provided by the Act it is to be treated as though it were a statute, binding upon the seller and the purchaser alike."[50]

The Commission, following exceptions by the City to the examiner's decision,[51] disposed of the City's objection in an even more summary fashion:

> The so-called ordinance 161–70 rate, according to the Initial Decision, was never agreed to by the parties or filed with the Commission. Any alleged violation of the ordinance is a local matter between the City and its officials. The ordinance cannot modify the provisions of the Federal Power Act or the regulations duly issued thereunder.[52]

We cannot accept this disposition of the issue.

By our analysis, the initial inquiry which the situation summoned was whether inclusion of the rachet clause in the letter agreement, and in turn in the filed rate schedule,[53] was in harmony with the terms of the ordinance and the understanding which the parties reached before the ordinance was enacted.[54] It cannot be gainsaid that the rachet clause exposed the City to substantially greater liability than a demand requirement without such a clause would have had, and the City has consistently maintained that racheting did not appear on the scene as a topic until the letter agreement was drafted. CEI contends that the racheting clause nevertheless did not outstep the authority conferred by the ordinance because the latter did not undertake to define how demand was to be determined. This argument leaves unanswered the question whether the parties' pre-ordinance agreement contemplated racheting, and the further question whether the City Council can give a city officer *carte blanche* to pass on a vital contractual specific upon which huge sums of public money may depend.

---

48. See notes 65–69 *infra* and accompanying text.

49. 181 F.2d 19 (8th Cir. 1950), *aff'd,* 341 U.S. 246, 71 S.Ct. 692, 95 L.Ed. 912 (1951).

50. *City of Cleveland v. Cleveland Elec. Illuminating Co., supra* note 22, 49 F.P.C. at 131, (examiner's initial decision), quoting *Northwestern Pub. Serv. Co. v. Montana-North Dakota Utils. Co., supra* note 49, 181 F.2d at 22.

51. See text *supra* at note 28.

52. *City of Cleveland v. Cleveland Elec. Illuminating Co.* (Opinion No. 644), *supra* note 28, 49 F.P.C. at 120.

53. See note 10 *supra* and accompanying text.

54. See note 3 *supra* and accompanying text.

In any event, CEI points to no evidence of industry custom or practice supporting the view that contract demand, standing alone, can mean anything other than actual calls for electrical power.

On the record as it now stands, there is undeniably a substantial but unresolved issue, in the first place, as to whether the letter agreement ever became binding on the City. More importantly, we are not free to " 'accept appellate counsel's *post hoc* rationalizations for agency action'; for an agency's order must be upheld, if at all 'on the same basis articulated in the order by the agency itself.' "[55] The truth of the matter is that neither the examiner nor the Commission addressed the possible inconsistency between the ordinance and the letter agreement occasioned by the presence of the rachet clause in the latter.[56] Both held merely that the letter agreement established the contract governing provision of the load transfer service, and that any impingement upon the Ordinance was an internal matter between the City and its officials.[57] The insuperable difficulty with this summary conclusion is that it overlooks the looming possibility that the City could enter into a contract for the load transfer service only by complying with its charter, which assertedly requires that all expenditures in excess of $500 have the authority of an ordinance, and provides that all noncomplying contracts shall be void.[58] It certainly does not automatically follow that the letter agreement, with the rachet clause, could rise to the dignity of a valid contract between the City and CEI without regard to the scope of authority conferred by the ordinance.

It seems, however, that at least the examiner's decision was not dependent on the conclusion that the letter agreement was valid irrespective of the constraints of the authorizing ordinance. He appears to have held that, under the "filed rate" doctrine, the rate on file with the Commission is the legal rate regardless of whether it is the rate agreed upon,[59] and surely that is the gloss put on his decision by counsel for the Commission. Counsel suggest that there is no requirement that both parties to a rate consent to it as a condition precedent to its effectiveness;[60] "Congress intended that the filed rate should become binding unless and until the Commission should decide otherwise through its administrative processes,"[61] and

[I]t seems quite illogical for Congress to provide for any kind of adjudicatory processes [for determining whether or not a rate is just and reasonable] if they envisioned the parties as being in agreement before a rate could take effect. In that event, the necessity for a hearing and regulation by the Commission would be obviated or, at least, reduced to whether the Commission agrees with the agreement of the parties. That the Commission's jurisdiction exceeds these bounds is so apparent as to not require citation of authority.[62]

We deem this position untenable. The City does not contend that the Commission is not free to determine whether rates required to be on file with it are just and reasonable, nor that only rates which have been agreed to by the parties can be filed.[63] The City does claim, how-

---

**55.** *FPC v. Texaco, Inc.,* 417 U.S. 380, 397, 94 S.Ct. 2315, 2326, 41 L.Ed.2d 141, 156 (1974), quoting *Burlington Truck Lines v. United States,* 371 U.S. 156, 168-169, 83 S.Ct. 239, 245-246, 9 L.Ed.2d 207, 215-216 (1962). See also *SEC v. Chenery Corp.,* 332 U.S. 194, 196, 67 S.Ct. 1575, 1577, 91 L.Ed. 1995, 1999 (1947).

**56.** See text *supra* at notes 49–52.

**57.** See text *supra* at notes 49–50, 52.

**58.** See note 4 *supra.*

**59.** See text *supra* at notes 49–50. .

**60.** Brief for Respondent at 16–17.

**61.** *Id.* at 17.

**62.** *Id.* at 18.

**63.** Moreover, the City does not deny that the rachet clause appeared in the letter agreement nor that one of its principal officials signed that document. A curious and unelucidated aspect of this episode, however, is the indulgence by the City's representative of the rachet clause in the letter agreement in ostensi-

ever, that where the parties have agreed to rates, only the rates agreed upon can be filed, and that in such instances it is error, which the Commission can later correct, to accept for filing a rate schedule which does not accurately reflect the parties' agreement.

We find the City's argument persuasive. The filed rate doctrine has been distilled from judicial embellishments of statutory provisions requiring submission of rates and charges to regulatory agencies.[64] Though not referring to the doctrine by its popular name, a leading Supreme Court decision applying the concept is *Pennsylvania Railroad Company v. International Coal Company*,[65] a case resolving charges of discrimination in tariff rates and rebates. Analyzing the legal effect of a tariff filed with the Interstate Commerce Commission, the Court observed that

> [t]he statute required the carrier to abide absolutely by the tariff . . . so long as it was of force, [it] was, in this respect to be treated as though it had

been a statute, binding as such upon railroad and shipper alike.[66]

In later years, the filed rate doctrine, in this distinctly limited form, has been applied to sales of electrical power,[67] natural gas [68] and services of other industries under federal regulation,[69] and in this fashion it has served a very useful purpose. The considerations underlying the doctrine, however, are preservation of the agency's primary jurisdiction over reasonableness of rates and the need to insure that regulated companies charge only those rates of which the agency has been made cognizant.[70] We perceive no reason why the doctrine should be employed to render unmodifiable a rate which has been filed in breach either of authority or contract. Surely the agency loses no control over the rate-setting process by allowing a party to show that the rate on file is a mistake.

▆▆▆ · Even more fundamentally, the proposition that a filed rate variant from an agreed rate is nonetheless the legal rate wages war with basic premises of

ble disregard of the ordinance. We are unable to ascertain whether that resulted from mere inadvertence, an understandable lack of appreciation of its legal significance, or otherwise, and we will indulge in no speculation on that score. The most that can be gleaned from the record is essentially negative: there is no evidence indicative of a prior dealing between the City and CEI utilizing a rachet clause or similar provision, with or without City Council approval; nor is there anything in the record to suggest that the clause had ever been considered by the City Council, even informally.

**64.** See cases cited *infra* notes 65–69. Read together, two sections of the Federal Power Act provide the statutory predicate for the doctrine in its application to public electric utilities. Section 205(c) provides in relevant part that "every public utility shall file with the Commission . . . schedules showing all rates and charges for any transmission or sale subject to the jurisdiction of the Commission, and the classifications, practices, and regulations affecting such rates and charges, together with all contracts which in any manner affect or relate to [them]." 16 U.S.C. § 824d(c) (1970). Section 205(d) requires in part that "[u]nless the Commission otherwise orders, no charge shall be made by any public

utility in any such rate, charge, classification, or service, or in any rule, regulation, or contract relating thereto, except after 30 days' notice to the Commission and to the public." 16 U.S.C. § 824d(d) (1970).

**65.** 230 U.S. 184, 33 S.Ct. 893, 57 L.Ed. 1446 (1912).

**66.** *Id.* at 197, 33 S.Ct. at 896, 57 L.Ed. at 1451.

**67.** See *e. g., Northwestern Pub. Serv. Co. v. Montana-Dakota Utils. Co., supra* note 49, 181 F.2d at 22–23: "the transmission of the electric energy being at wholesale and interstate, the seller must collect the charge named in the filed rate and the purchaser must pay that rate. So long as the filed rate is not changed in the manner provided by the Act, it is to be treated as though it were a statute, binding upon the seller and purchaser alike."

**68.** See *e. g., Hope Natural Gas Co. v. FPC,* 134 F.2d 287, 311 (4th Cir. 1943), *rev'd on other grounds,* 320 U.S. 591, 64 S.Ct. 281, 88 L.Ed. 333 (1944).

**69.** See, *e. g., Robinson v. Baltimore & O. R.R.,* 222 U.S. 506, 509–510, 32 S.Ct. 114, 115–116, 56 L.Ed. 288, 289–290 (1912) (railroad).

**70.** See cases cited *supra* notes 65–69.

the Federal Power Act.[71] That legislation effectuates a congressional scheme under which electric utilities establish initially, by contract or otherwise, the rates they will charge, subject to revision by the Commission on a finding of unlawfulness.[72] To be sure, the utility may, without negotiation or consultation with anyone, set the rates it will charge prospective customers, and change them at will, so long as they have not been set aside by the Commission on grounds of inconsistency with the Act.[73] Alternatively, since the Act by requiring rate contracts to be filed with the Commission[74] recognizes that rates can also be set by individual contracts with customers,[75] the utility may "fix by contract, and change only by mutual agreement, the rate agreed upon with a particular customer."[76] And it is well settled that a contracted rate cannot be changed by the unilateral act of either party to the contract.[77]

It is essentially upon this branch of jurisprudence that the City's assault upon the rachet clause rests.[78] Its thesis is that, before action by its City Council or execution of the letter agreement, it had reached agreement with CEI as to the rates to be charged for the proposed load transfer service, and that a racheting of contract demand was not a part of the bargain. Later, the City states, when the transaction was reduced to writing, the rachet clause was incorporated into the finished product, and somehow escaped attention for months to come. So, the City says, CEI unilaterally changed the preexisting contract by filing the letter agreement embracing a purported contract term—the rachet clause—to which the City had not assented.

■ We do not, of course, assess the merit of the City's position, nor do we intimate any view as to it.[79] We think,

**71.** See the elaborate discussion in *United Gas Pipe Line Co. v. Mobile Gas Serv. Corp.*, 350 U.S. 332, 337–344, 76 S.Ct. 373, 377–381, 100 L.Ed. 373, 382–387 (1956), addressing the Natural Gas Act, Act of June 21, 1938, ch. 556, 52 Stat. 821, as amended, 15 U.S.C. §§ 717 *et seq.* (1970). The filing and rate-revision provisions of the Federal Power Act "are in all material respects substantially identical to the equivalent provisions of the Natural Gas Act." *FPC v. Sierra Pac. Power Co.*, 350 U.S. 348, 353, 76 S.Ct. 368, 371–372, 100 L.Ed. 388, 394 (1956); see also *Permian Basin Area Rate Cases (Continental Oil Co. v. FPC)*, supra note 36, 390 U.S. at 821, 88 S.Ct. at 1388, 20 L.Ed.2d at 366; *Richmond Power & Light v. FPC*, 156 U.S.App.D.C. 315, 317, 481 F.2d 490, 492, cert. denied, 414 U.S. 1068, 94 S.Ct. 578, 38 L.Ed.2d 473 (1973). Thus *Mobile* supplies excellent guidance in the case at bar.

**72.** *United Gas Pipe Line Co. v. Mobile Gas Serv. Corp.*, supra note 71, 350 U.S. at 338–344, 76 S.Ct. at 377–381, 100 L.Ed. at 383–386. See also *Permian Basin Area Rate Cases (Continental Oil Co. v. FPC)*, supra note 36, 390 U.S. at 822, 88 S.Ct. at 1388–1389, 20 L.Ed.2d at 367.

**73.** *United Gas Pipe Line Co. v. Mobile Gas Serv. Corp.*, supra note 71, 350 U.S. at 343, 76 S.Ct. at 380, 100 L.Ed. at 386.

**74.** Federal Power Act § 205(c), 16 U.S.C. § 824d(c) (1970). See note 64 *supra.*

**75.** *United Gas Pipe Line Co. v. Mobile Gas Serv. Corp.*, supra note 71, 350 U.S. at 338,

343, 76 S.Ct. at 377–378, 380, 100 L.Ed. at 383, 386.

**76.** *Id.* at 343, 76 S.Ct. at 380, 100 L.Ed. at 383.

**77.** *Permian Basin Area Rate Cases (Continental Oil Co. v. FPC)*, supra note 36, 390 U.S. at 820–822, 88 S.Ct. at 1387–1389, 20 L.Ed.2d at 366–367; *FPC v. Sierra Pac. Power Co.*, supra note 71, 350 U.S. at 353, 76 S.Ct. at 371–372, 100 L.Ed. at 394; *United Gas Pipe Line Co. v. Mobile Gas Serv. Corp.*, supra note 71, 350 U.S. at 337–344, 76 S.Ct. at 377–381, 100 L.Ed. at 383–386; *Richmond Power & Light v. FPC*, supra note 71; *Portsmouth Gas Co. v. FPC*, 101 U.S.App.D.C. 99, 102–103, 247 F.2d 90, 93–94 (1957); *Cincinnati Gas & Elec. Co. v. FPC*, 101 U.S.App.D.C. 1, 6, 246 F.2d 688, 693 (1957). To be sharply distinguished is the Commission's authority to revise rate agreements "in circumstances of unequivocal public necessity." *Permian Basin Area Rate Cases (Continental Oil Co. v. FPC)*, supra note 36, 390 U.S. at 822, 88 S.Ct. at 1388–1389, 20 L.Ed.2d at 367. See also *FPC v. Sierra Pac. Power Co.*, supra note 71, 350 U.S. at 353–355, 76 S.Ct. at 371–373, 100 L.Ed. at 394–395; *United Gas Pipe Line Co. v. Mobile Gas Serv. Corp.*, supra note 71, 350 U.S. at 344–347, 76 S.Ct. at 381–382, 100 L.Ed. at 386–388.

**78.** The blind administrative application of the filed rate doctrine, without regard to the events forerunning the filing, misses the mark completely.

**79.** Similarly, we intend no intimation as to any justification which CEI may have.

however, that a utility is no more at liberty to alter an agreed rate as yet unfiled than it is to depart from one that has been filed.[80] And it goes without saying that the City is entitled to an adjudication of its claim of contract-change on a legally sound basis.

■ It may be that the Commission could not readily have detected the problem as to the filed rate at the time CEI made its rate submissions.[81] But when, during the proceeding under review, the Commission was alerted to the possibility that the filed rate was infirm, it did not exert its authority to resolve the difficulty. The Commission is statutorily empowered to "issue . . . such orders . . . as it may find appropriate to carry out the provisions of" the Act,[82] a power undoubtedly extending to unauthorized rate filings.[83] We do not hesitate to characterize the City's claim that a component of the filed rate was inefficacious as a matter warranting investigation. Here the Commission was unmoved because it felt that the filed rate doctrine made any effort in that direction unnecessary or improper. We have now delineated our disagreement on that score, and it is clear enough that a rate schedule, though previously accepted by the Commission for filing, is not unalterable when corrections are clearly in order.[84]

■ The administrative approach taken in this case is puzzling, to say the least, for in accepting CEI's schedule submissions the Commission certainly did not view the rates specified therein as unchangeable. In each of its two letters accepting the schedule and the supplements thereto,[85] the Commission declared that "[t]his acceptance for filing does not constitute approval of any service, rate, [or] charge, . . . or any . . . contract or practice affecting such rate or service provided for in the . . . rate schedule. . . ."[86] "[N]or," said the Commission further, "shall such acceptance be deemed as recognition of any claimed contractual right or obligation affecting or relating to such service or rate. . . ."[87] Rather, the Commission emphasized that "such acceptance is without prejudice to any findings or orders which may have been or may hereafter be made by the Commission . . . hereafter instituted . . . against your company."[88] The qualifications upon the Commission's acceptance of CEI's schedule-filing which these explicit disclaimers imposed left the door wide open for such corrections and adjustments of the filed rate structure as subsequently disclosed information might warrant. When this litigation was before the Commission, it did not see fit to pass through that door. Our decision today makes plain the Commission's responsibility to do so now.[89]

**80.** *Sam Rayburn Dam Elec. Cooperative v. FPC,* 169 U.S.App.D.C. 281, 291, 515 F.2d 998, 1008 (1975); *Borough of Lansdale v. FPC,* 161 U.S.App.D.C. 185, 187, 188, 195, 494 F.2d 1104, 1106, 1107, 1114 (1974). "Rate filings consistent with contractual obligations are valid; rate filings inconsistent with contractual obligations are invalid." *Richmond Power & Light v. FPC, supra* note 71, 156 U.S.App.D.C. at 318, 481 F.2d at 493 (footnote omitted).

**81.** As we have mentioned, CEI did not submit the authorizing ordinance as a formal part of the letter agreement specifying the rates, but merely listed it as an accompanying document. See note 10 *supra.*

**82.** "The Commission shall have power to perform any and all acts, and to prescribe, issue, make, amend, and rescind such orders, rules, and regulations as it may find necessary or appropriate to carry out the provisions of this chapter. . . ." Federal Power Act § 309, 16 U.S.C. § 825h (1970).

**83.** *United Gas Pipe Line Co. v. Mobile Gas Serv. Corp., supra* note 71, 350 U.S. at 347, 76 S.Ct. at 382, 100 L.Ed. at 388.

**84.** *Id.*

**85.** See note 11 *supra.*

**86.** See note 11 *supra.*

**87.** See note 11 *supra.*

**88.** See note 11 *supra.*

**89.** "[W]here agency action must be set aside as invalid, but the agency is still legally free to pursue a valid course of action, a reviewing court will ordinarily remand to enable the agency to enter a new order after remedying the defects that vitiated the original action."

We reverse the Commission's disposition of the rachet-clause issue. We affirm the Commission in all other respects. We remand the case to the Commission for further proceedings consistent with this opinion.

So ordered.

*Williams v. Washington Metropolitan Area Transit Comm'n*, 134 U.S.App.D.C. 342, 359–360, 415 F.2d 922, 939–940, (*en banc* 1968), *cert. denied*, 393 U.S. 1081, 89 S.Ct. 860, 21 L.Ed.2d 773 (1969) (footnote omitted).